**UNITED STATES of America,**

v.

**Angel Raphael LORA and Ruben Lora, Defendants.**

**No. CR. 98–10054–NG.**

United States District Court,
D. Massachusetts.

Feb. 20, 2001.

---

Owen S. Walker, Office of the Federal Defender, Boston, MA, John M. Verdecchia, Providence, RI, for Rubin Lora, defendant.

Lenore Glaser, Stern, Shapiro, Weissberg & Garin, Boston, MA, for Luis Lora aka Chino, defendant.

Charles P. McGinty, Federal Defender Office, Boston, MA, RI, Matthew B. Smith, Providence, RI, for Victor Rojas aka Tito, defendant.

Andrew Morganstern, Mineola, NY, for Bankers Trust Company of California, interested party.

Linda Taverni, Deily, Dautel & Mooney, Albany, NY, for Chrysler Financial Company, interested party.

Michael D. Ricciuti, U.S. Attorney's Office, Boston, MA, for U.S.

Eileen Donoghue, Lowell, MA, Leo S. Fama, II, Everett, MA, for Angel Rafael Lora, defendant.

## *SENTENCING MEMORANDUM*

GERTNER, District Judge.

### TABLE OF CONTENTS
#### *SENTENCING MEMORANDUM*

I. *INTRODUCTION* .................................................80

II. *FACTUAL BACKGROUND* ...........................................81
   A. *The Offense* ...........................................81
     1. *The January 21 Meeting* ..............................82
     2. *The January 26 and 27 Telephone Conversations* .......83
     3. *The January 28 Meeting* .............................83
     4. *The January 29 Meeting* .............................83
     5. *The Weekend Visit* ..................................85
     6. *The February 6 Transaction* .........................85
   B. *The Defendants* .......................................86

III. *THE SENTENCING HEARINGS* .....................................86
   A. *The Loras' Expert—Michael Levine* .....................86
   B. *The Government's Expert—Michael Cunniff* ..............87

IV. *SENTENCING ANALYSIS* ..........................................88
   A. *Note 15 Departures* ...................................88
     1. *Background to Note* ..................................88
     2. *The Note 15 Standard* ...............................90
       a. *Note 15's Application to Reduction–of–Down–Payment Cases* .........91
       b. *The Defendant's Resources and Predisposition* ......93
     3. *Application of Note 15 to the Loras* .................94
       a. *The Price of the Cocaine* ..........................94

    b.   *The Loras' Ability and Intention to Purchase Sixty–Five Kilograms* ...............................................................95
  B.  *Adjustments for Aggravated Roles in the Offense* ...........................96
    1.  *Standard for Aggravating Role Adjustments* ...........................97
    2.  *Angel Lora's Role in the Offense* .........................................98
    3.  *Ruben Lora's Role in the Offense* ........................................99
    4.  *Departure for Relative Responsibility* ..................................99

V.  *CALCULATION OF SENTENCES* .................................................99
  A.  *Angel Lora* ............................................................99
    1.  *Base Offense Level* ......................................................99
    2.  *Role Adjustment* .......................................................100
    3.  *Acceptance of Responsibility Adjustment* .........................100
    4.  *Total Offense Level* ....................................................100
    5.  *Criminal History* ......................................................100
    6.  *Departures* ............................................................100
    7.  *Sentence* ...............................................................100
  B.  *Ruben Lora* ...........................................................100
    1.  *Base Offense Level* .....................................................100
    2.  *Role Adjustment* .......................................................100
    3.  *Acceptance of Responsibility Adjustment* .........................100
    4.  *Total Offense Level* ....................................................100
    5.  *Criminal History* ......................................................100
    6.  *Departures* ............................................................101
    7.  *Sentence* ...............................................................101

VI.  *CONCLUSION* ..............................................................101

## I. INTRODUCTION

This Memorandum concerns the sentencing of two brothers, Angel Raphael Lora ("Angel") and Ruben Lora ("Ruben"). The case raises important issues for sentencing in general, and drug cases in particular: In a sentencing regime that largely equates culpability with the amount of drugs attributable to the defendant, the potential for abuse by law enforcement agents is substantial. In normal sting operations, the agent can increase quantity simply by delaying arrest until the agent has made four or five "buys" rather than one or two. And the additional amount of drugs the defendant sells to the agent goes a long way to determine the defendant's ultimate sentence under the U.S. Sentencing Guidelines ("the Guidelines").

In reverse sting operations, where the government supplies the drugs, the risk of abuse is magnified. By changing the

terms of the deal—lowering the price, offering favorable credit terms, etc.—the government can transform a defendant who is a small dealer into a more substantial one, without regard to the defendant's proclivities. The government may not only fix the drug quantity, as in the ordinary sting, it may well expand the scope of the crime to include additional participants, firearms, or money laundering.

The Loras pled guilty to one count of conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. § 846, and one count of possession of, or aiding and abetting the possession of, cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 18 U.S.C. § 2. At sentencing, they filed motions for downward departures on the basis of U.S. Sentencing Guidelines Manual ("U.S.S.G.") section 2D1.1, application note 15 ("Note 15"), which authorizes departures in certain reverse sting scenarios.[1]

1. In November 1993, the U.S. Sentencing Commission ("the Commission") amended the Guidelines to provide:

If, in a reverse sting (an operation in which a government agent sells or negotiates to sell a controlled substance to a defendant),

The Loras claim the government ensnared them in a reverse sting operation in which the quantity of cocaine increased while the down payment decreased. They allege that the government's reduction of the down payment from $50,000 to $27,000, for a $1,137,500 purchase of sixty-five kilograms of cocaine, led them to purchase more cocaine than their available resources otherwise would have allowed.

The government opposed the motion for departure. The government argues that Note 15 does not even speak in terms of down payments, but only in terms of market price. In any event, the government asserts that (1) the price or down payment for the cocaine was not below market value, and (2) even if the price or down payment were artificially low, it did not lead the Loras to purchase more cocaine than they otherwise would have purchased.

Due to the significance of the issues and the stakes involved, I held three days of hearings, heard expert testimony on illicit drug markets, read six sentencing briefs, and reviewed volumes of exhibits, including transcripts of the undercover tape recordings of the Loras' negotiations with government agents. After considering the entire record before me, I cannot find that the Loras were lulled by government conduct into a purchase beyond their means.

While it is true that over the course of the negotiations for the drugs, the drug quantity went up and the down payment went down, the Loras were not passive recipients of government largesse. Their words and their actions, both during the course of the negotiations and in their past, suggested that they were predisposed to deal at the multi-kilogram level and that their record of drug dealing put them in a position to demand more favorable payment terms. In the final analysis, the Loras were responsible for the vectors: The Loras, not the government agents, increased the quantity of drugs purchased; and the Loras, not the agents, insisted on no down payment. Thus, as I explain in more detail below, the Loras' motions for downward departures [docket ## 147, 151] are **DENIED.**

While Ruben and Angel were both involved in the transactions, and both must be held responsible for the full sixty-five kilograms of cocaine they jointly agreed to purchase, Ruben played a lesser role in a number of significant ways. As a result, I depart down one offense level pursuant to U.S.S.G. section 5K2.0. Given the unusual facts of this case, I find U.S.S.G. section 3B1.1(b), which provides for a three-level upward adjustment on account of Ruben's managerial status, places excessive weight on Ruben's aggravated role in the offense.

## II. *FACTUAL BACKGROUND*

As becomes evident through my discussion in Part IV below, Note 15 cases require a fact-intensive analysis. I will describe my general findings first, and then more specific fact findings.

### A. *The Offense*

In January 1998, the government's primary cooperating witness ("CW1") repeatedly contacted Ruben by telephone. CW1, as Ruben understood it, insisted that Ruben repay an outstanding debt Ruben owed to a former drug dealer, Nelson Mendez ("Mendez"). The initial contact led to protracted negotiations: On the one side, Ruben and Angel negotiated on behalf of the Lora conspirators.[2] On

---

the court finds that the government agent set a price for the controlled substance that was substantially below the market value of the controlled substance, thereby leading to the defendant's purchase of a significantly greater quantity of the controlled substance than his available resources would have allowed him to purchase except for the artificially low price set by the government

agent, a downward departure may be warranted.

U.S.S.G. § 2D1.1, cmt. n. 15.

2. As discussed below, the drug conspiracy involved at least six participants: (1) Ruben Lora; (2) Angel Raphael Lora; (3) Ruben's associate, Victor Rojas ("Rojas"); (4) Ruben and Angel's brother, Luis Lora ("Luis"); (5)

the other side, CW1, a second unidentified cooperating witness ("CW2"), and undercover agents Eduardo Dominguez ("Dominguez") and Antonio Dillon ("Dillon") represented the government.

The Loras negotiated for the purchase of sixty-five kilograms of cocaine with the following conditions: (1) The Loras would pay $17,500 per kilogram of cocaine ($1,137,500 total), (2) with $50,000 cash on delivery, and (3) payment-in-full within fifteen days thereafter. While it is true that the terms got more favorable over time—more quantity, lower down payment—it is equally true that the Loras, not the agents, were responsible for the changes. In fact, if the Loras had listened to the informants, it is likely the Loras would have agreed to purchase a much smaller quantity of cocaine, with a more substantial down payment.

### 1. *The January 21 Meeting*

On January 21, 1998, CW1 and CW2 met with Ruben at a train station in Providence, Rhode Island. CW1 and CW2 posed as members of a large, Colombia-based, narcotics trafficking organization, which was operating locally in Boston, Massachusetts. CW2 informed Ruben that they contacted Ruben because CW2 had assumed an $18,000 debt Ruben owed to another drug dealer, Mendez. According to CW2, Mendez had conducted business with CW2 prior to Mendez's incarceration on drug charges.

Ruben acknowledged that he owed Mendez such a debt, which derived from a transaction eighteen months earlier in which Ruben purchased cocaine from Mendez. Ruben indicated that the transaction involved thirty kilograms. Unable to distribute all of the cocaine, Ruben returned four kilograms to Mendez. Ruben then failed to produce $18,000 he owed Mendez on the deal. CW2 told Ruben, "[t]hat money is mine."

CW2 relayed to Ruben that Mendez spoke highly of Ruben. In fact, Mendez informed CW2 that Ruben had been Mendez's best customer. Ruben admitted to purchasing cocaine from Mendez at wholesale, suggesting that Mendez supplied Ruben with "thirty-five, forty points." [3] Ruben informed the cooperators that he did not have any money to pay off his debt to CW2. All he had was his business, a nightclub, which was not profitable. He could make money "on the street" but not in the bar. He owed money to credit card companies, the IRS, and the nightclub's former owner.

CW2 then raised the subject of Ruben's drug trafficking activities, asking "what capacity can you move weekly?" Ruben responded that it varied according to the price and quality. Currently, he paid a price of "eighteen" (i.e., $18,000 per kilogram of cocaine) in New York. Ruben also volunteered that he was visiting Providence that day with a friend who dealt in "H" (i.e., code for heroin). He informed the cooperators that he personally dealt in heroin as well. But, Ruben confessed, he had not been "doing anything" (referring to cocaine trafficking in particular) for the previous year and a half until he bought "ten" on January 12, 1998, roughly one week earlier. He owed his suppliers $8,000 on that deal. Ruben predicted that it would take him ten or eleven days total to collect all of the money his customers owed him.

The cooperators turned the discussion to the ways in which Ruben could pay off his

Angel's girlfriend, Anna Conde ("Conde"); and (6) Ruben and Angel's sister, Sabrina Lora ("Sabrina"). The indictment charged only Ruben, Angel, Rojas, and Luis with the instant offenses.

**3.** Later, Mendez informed the U.S. Attorney's Office that Mendez dealt in much smaller quantities with both Ruben and Angel. The government's disclosure indicates that Mendez supplied Ruben with a total of ten to fifteen kilograms of cocaine. Mendez supplied Angel with cocaine on three or four occasions, totaling five kilograms.

$18,000 debt. They repeatedly emphasized the seriousness and the "urgency" of the situation. They proposed a deal: Ruben would purchase some cocaine from them so that he could sell it and pay off his debt from his profits. The cooperators, however, would require a down payment before they would supply Ruben with cocaine. Specifically, CW2 suggested fifteen kilograms and an $8000 down payment.

Repeatedly, Ruben resisted the idea. He indicated that he was unable to gather enough money to make a down payment because he owed other people money as well. He also rejected any down payment, claiming he always "fronts" drugs for his clients. His clients, he added, were people with assets who paid him without fail after receiving the drugs.

The cooperators encouraged Ruben to meet with his "friends" within the next few weeks, and to seek his friends' assistance in raising a down payment for the fifteen-kilogram deal. Again, Ruben objected to the down payment, arguing that he had no cash but he did have a lot of "capacity" to sell cocaine. He alluded to "another person" (presumably his brother, Angel) who might be interested in making a deal. Indeed, he suggested a continuing relationship. Ruben offered to take the cooperators to his house in Rochester, New York, where they could meet his wife and children, and he could prove his legitimacy and seriousness.

Every fifteen days, Ruben indicated, Ruben and his partner could do "thirty," "forty," or "fifty." Eventually, Ruben made a counter-offer: He would buy five or six kilograms on credit and fully repay the cooperators five days after delivery.

The conversation ended without an agreement. Ruben agreed to follow up on their proposal with his "friends," but he insisted that it might be impossible for him to work with the cooperators due to his precarious financial situation.

4. Angel brought along the Loras' mother, Brina. Angel indicated that the parties could

## 2. The January 26 and 27 Telephone Conversations

On January 26, 1998, Ruben paged CW1. CW1 returned the call. Ruben told CW1 that Ruben would like to meet again. Ruben said he knew two or three individuals who were ready to purchase cocaine from him immediately. The clients could dispose of "four or five CD's" during the next several days. CW1 told Ruben to call back later. While the parties did not reach agreement at this time, they agreed to meet on January 28, 1998, at a McDonald's Restaurant located in North Attleboro, Massachusetts.

## 3. The January 28 Meeting

On January 28, 1998, CW1 met Ruben at the McDonald's Restaurant. The meeting covered much of the same ground covered during Ruben's first meeting in Providence. The parties again discussed Ruben's plans for paying off the $18,000 debt.

Ruben advised CW1 that Ruben, personally, did not sell cocaine in the Rochester area, but that Ruben's brother, Angel, did. Ruben offered to introduce CW1 to Angel. The two brothers, Ruben stated, were interested in purchasing more than the fifteen kilograms the cooperators had proposed. The Loras were interested in purchasing thirty to thirty-five kilograms. During the meeting, Ruben spoke with Angel by telephone and arranged for Angel to meet with CW1 the next day in North Attleboro.

Again, CW1 insisted that his organization would require Ruben to pay a percentage of the deal up front. The parties agreed to meet the next day.

## 4. The January 29 Meeting

On January 29, 1998, Ruben and Angel met CW1 for lunch at the Olive Garden Restaurant in North Attleboro, Massachusetts.[4] CW1 and the Loras discussed Ru-

discuss drug transactions in front of her.

ben's debt to CW1. Ruben indicated that although the Loras usually worked separately, Angel would work with Ruben on this deal in order to help Ruben pay off the debt. Angel informed CW1 that he purchased cocaine at $18,000 per kilogram in New York, and currently owed $60,000 to his suppliers.

The parties then discussed the details of the anticipated transaction. First, they addressed the amount of cocaine the Loras wished to purchase. At one point, Ruben offered to purchase twelve to fifteen kilograms for himself. Then, based on the information Ruben shared with CW1 about the brothers' joint capacity, CW1 offered to supply the Loras with thirty to thirty-five kilograms. CW1 explained that he would require a down payment to prove the Loras were operating in good faith. CW1 also told them he would like to visit them in Rochester before completing the deal.

Angel agreed that CW1 should visit their homes and businesses to earn CW1's trust before CW1's organization would entrust the Loras with something of such great value.

Angel then, as they say, "upped the ante." He requested that his share of the purchase be fifty kilograms, with Ruben taking an additional fifteen. Angel assured CW1 that Angel, acting alone, could handle sixty to seventy kilograms.[5]

Second, the parties discussed the amount of the down payment. Angel argued that a down payment of $80,000 or less would be a "trifle" given the value of sixty-five kilograms of cocaine. The Loras insisted that no one required a down payment of that size.

Third, the discussion turned to the price. CW1 asked if the Loras could pay $18,000 per kilogram. Angel agreed, but argued CW1 should reduce the price in subsequent transactions. Ruben calculated the total value of the deal to be worth over $1,000,000.

CW1 balked at the size of the transaction. Since it was their first deal together, CW1 suggested the Loras buy a smaller amount. Ruben then proposed a thirty-five kilogram deal, the amount CW1 had started with, but Angel opposed Ruben. Angel maintained that he could handle whatever quantity CW1 supplied, and that he was seeking to replace his New York suppliers altogether. Angel would buy exclusively from CW1's organization if CW1 could offer a lower price than $18,000 per kilogram.

CW1 gave them the choice of a smaller quantity of cocaine with a smaller down payment, or a larger amount with a larger down payment. Specifically, CW1 proposed a transaction involving fifteen to twenty-five kilograms and $20,000 or $25,000 down payment, or a thirty-five to fifty kilogram deal and more money down. CW1 emphasized the sensitivity of the matter: The Loras could not "play with" him.

More haggling ensued. Angel promised to send his brother, "El Chino" (a.k.a. Luis Lora), to deliver some of the money Angel owed CW1 every three or four days. When Ruben momentarily absented himself to use the restroom, Angel proposed an even larger deal—200 kilograms if CW1 could offer Angel a good price. Angel said he did not want to speak openly in front of Ruben because Ruben did not know the extent of Angel's business. When Ruben returned to the table, Angel told CW1 the

---

5. CW1 responded that the Loras were scaring CW1 by requesting such a large amount of cocaine. Angel assured CW1 that Angel could handle that quantity, but Angel required two weeks to distribute it and make full repayment. Angel disclosed that he sold some cocaine through his laundry business for cover. Then, CW1 asked the Loras to help CW1 launder money. The parties discussed this possibility at great length, but the Loras did not guarantee anything. They insisted that CW1 speak with their sister, Sabrina, about laundering funds when CW1 visited Rochester. Subsequently, the conversation returned to the main theme.

brothers had been in business for ten or twelve years. The parties agreed to finalize the terms of the deal when CW1 visited the Loras in Rochester.

### 5. *The Weekend Visit*

From January 30 to February 2, 1998, CW1 and CW2 visited the Loras in Rochester, New York. The cooperators met the brothers' families and inspected the brothers' properties and businesses, some of which were purportedly purchased with drug money, including Ruben's business, the Quesqueya Night Club.

On January 30 and 31, Ruben filled in the details of his business dealings with Mendez. In addition, Ruben indicated that he purchased approximately two kilograms of heroin per week from individuals known by the names "Hector" and "Caesar." [6] (CW1 witnessed Hector and Caesar counting money at Ruben's home on February 1.) Ruben also revealed that he laundered drug proceeds through his night club.

CW1 visited Angel and Sabrina on February 1 and 2. Angel and Sabrina claimed to be in business together, boasting that they had laundered money through National Bank and Credit in New York, New York, where Sabrina had worked for some time. During the weekend, Angel pressed CW1 for more than sixty-five kilograms. He proposed a 100 or 200–kilogram deal on the condition that CW1 charge less than $18,000 per kilogram. Finally, the terms of the transaction were ironed out: The Loras agreed to buy sixty-five kilograms of cocaine for $17,500 per kilogram, a $50,000 down payment, and repayment of the balance within fifteen days after delivery.

### 6. *The February 6 Transaction*

Originally, the parties agreed to conduct the transaction on February 3, but the Loras encountered difficulties raising the cash to make the $50,000 down payment. The deal was postponed.

Finally, on February 6, Agent Dominguez accompanied CW1 to the Holiday Inn in Boxboro, Massachusetts.[7] Angel met them in the parking lot. He drove a Ford Windstar van. Angel's girlfriend, Conde, accompanied him. Parked next to the Ford van was a green Dodge van occupied by Luis. CW1, Dominguez, and Angel entered the Holiday Inn to wait for Ruben.

Upon questioning by CW1 and Dominguez, Angel confessed to bringing only $27,500 for the down payment. Angel insisted the transaction should proceed as planned because Angel knew "good" people, clients who would buy all of the cocaine immediately. Angel promised to send the agents $200,000 or more every three or four days, until Angel paid off the balance. Angel would send Luis as the money courier.

Dominguez telephoned Agent Dillon to ask if the deal could go forward for $27,000 down. Despite the Loras' inability to produce the $50,000 down payment, Dillon cleared the transaction. Subsequently, Ruben arrived in a truck with co-defendant Rojas. Ruben told the agents that neither Ruben nor Rojas brought money to make the down payment. Ruben explained that Rojas stashes the cocaine at Rojas' mother's house before Ruben and Rojas sell it.

The participants drove to a restaurant located near the warehouse where the Loras planned to pick up the cocaine. There, Angel gave CW1 only $27,000 in cash. CW1, Ruben, and Rojas remained at the restaurant while Dominguez, Angel, Luis, and Conde drove to the warehouse. Angel and Luis backed Angel's vans into the warehouse. After Angel inspected the cocaine, Dominguez placed fifteen kilograms

---

**6.** At the January 21 meeting in Providence, Ruben told the cooperators that Caesar was a Guatemalan source who supplied Ruben with heroin.

**7.** Dominguez wore a recording device.

in a box for Ruben. With help from Conde, Luis began to load cocaine into the secret compartments in one of the vans. Then, Angel hesitated and counted the kilograms. He found there were only fifty-one kilograms present in the warehouse. The agents subsequently arrested Angel, Luis, and Conde. Ruben and Rojas were arrested soon thereafter.

### B. *The Defendants*

Angel, age forty-three, is a legal resident of the United States and a citizen of the Dominican Republic. His parents divorced when he was nine years old. At age twenty, Angel moved to the United States after graduating from the Technical and Vocational School of San Pedro De Marconis.

Prior to the instant offense, Angel lived with Conde for ten years. The couple has two children together, Jennifer, age ten, and Angel, age seven. By his ex-wife, Theresa Javier, Angel has two other children: Angela, age seventeen, and Eurania, age fifteen. Angel divorced Javier in 1986, but Angela and Eurania resided with Angel until the time of the instant offense. Conde's children from a prior marriage also lived with Conde and Angel. Angel has been active and supportive in his children's lives. The PSR reports that Angel's arrest and prosecution has taken its toll on his family.

Ruben, age thirty-eight, was born in the Dominican Republic as well. He is now a citizen of the United States. Six years old when his parents divorced, Ruben lived with his father until he was sixteen. He then moved to Santo Domingo to seek employment, where he had numerous occupations. In Santo Domingo, Ruben had two children—Dariana Merlisa Lora, age eighteen, and Ana Kela Obiedo, age fifteen—with two different women.

Ruben immigrated to the United States at age twenty-five. In 1987, he moved to Providence, Rhode Island, to live with his girlfriend, Eva Pagan. He has one child by Pagan, Larry, age ten, who resides with his maternal grandmother in Santo Domingo. Ruben and Pagan separated in 1992. Ruben became a naturalized citizen that same year.

Ruben married Luz Martes in 1993. The couple moved to Penfield, New York, in 1995 to open his bar. In 1996, Ruben and Martes divorced. In 1997, Ruben married his current wife, Melva Ivonne Fiorentino. Ruben's three children were living him and his wife at the time of his offense. After Ruben's arrest, his wife and children moved back to the Dominican Republic.

Neither defendant has a noteworthy criminal record.[8]

## III. *THE SENTENCING HEARINGS*

The central question addressed at the various sentencing hearings was whether the reverse sting operation in this case reflected actual market practices, particularly whether the down payment was artificially low in light of all the circumstances. The Loras and the government each offered the testimony of former special agents of the Drug Enforcement Administration ("DEA") to support their arguments on the Note 15 issue. I summarize both witnesses' testimony before addressing the merits of the Loras' motions.

### A. *The Loras' Expert—Michael Levine*

By way of affidavit and live testimony, the Loras offered the opinion of former DEA agent Michael Levine ("Levine") to support their argument that the government agents offered the Loras an artifi-

---

8. Ruben pled guilty to a disorderly conduct charge in Rochester City Court, June 12, 1997. He was originally charged with Unlawful Dealing of Alcohol to a Minor after the Rochester Police conducted a routine inspec-

tion of his bar and determined that Ruben sold alcohol to a twenty-year old individual. The conviction does not yield any criminal history points.

cially low down payment.[9] Levine concluded that it is "highly unlikely" that a large-scale drug organization would agree to deliver sixty-five kilograms of cocaine (worth $1,137,500 at $17,500 per kilogram) for only $27,000 down, particularly when the buyer had never purchased more than five kilograms in the past.

Levine testified that, if Ruben could not produce a satisfactory explanation for the discrepancy between the amount of cocaine Ruben requested and the amount of cocaine Ruben had dealt in the past, a true top-level dealer would take one of the following actions: (1) Refuse to deal with Ruben altogether; (2) insist on, at minimum, a down payment that would cover the dealer's cost, which would be an estimated one-third to one-half of the total price; or (3) rely on some other tactic that would guarantee full payment. Levine Aff. at 6. As to the last option, Levine testified that legitimate drug suppliers would have taken two or more of the following steps to ensure repayment: (1) Only deal with people who possess real property or a business of sufficient value to cover the loss of the merchandise, and make that property accessible to the trafficker until the debt is paid; (2) deal

through a letter of credit or other method of bank transfer; (3) tour the buyer's drug-dealing operation to verify claims of abilities to distribute; and/or (4) on rare occasions, demand a hostage. Since he believed the government did not take sufficient steps to ensure repayment, Levine concluded the sting did not resemble true black market transactions.

### B. *The Government's Expert—Michael Cunniff*

The government submitted the testimony of former DEA agent Michael Cunniff ("Cunniff") to rebut Levine's testimony.[10]

Cunniff testified that the price per kilogram of cocaine set by CW1—$17,500— was well within market range. Defendants do not dispute this point. Cunniff also averred that the amount of down payment required in any given deal results from a delicate balance in the bargaining process. Often times, domestic traffickers are suspicious when a supplier requires a large down payment. Drug traffickers began to view down payments with suspicion in the mid–1980s when Congress passed asset forfeiture provisions authorizing the confiscation of drug proceeds upon the ar-

9. Levine enjoyed a distinguished career with the DEA for many years. I credit Levine's testimony, but I also find it less helpful than the testimony offered by the government. First, Levine retired more than ten years ago after having served much of his later career in Central and South America. Thus, his knowledge of black market practices in New England during the last decade is more limited than that of the government's witness. Second, at the hearing and in his affidavit, Levine acknowledged that he did not have the opportunity to review all of the transcripts of the undercover tapes in this case. His conclusions, therefore, are based on an incomplete set of facts. Third, Levine testified in response to specific questions, posed by defense counsel, that improperly narrow the scope of the present inquiry. Defense counsel asked Levine to answer two questions: (a) "[W]ould a genuine large-scale organization entrust, with a down payment of only $27,000, 65 kilograms of cocaine to individuals with whom they had [previously] dealt only at the 5–kilo–or–less level and with whom they had

not dealt at all for at least 18 months and possibly longer?"; and (b) "if such an organization were to entrust that amount of cocaine (with $27,500 down payment) to such individuals, what (if any) steps would they take to ensure they would be repaid?" Affidavit of Michael Levine, dated July 14, 2000, at 1–2 [hereinafter "Levine Aff."]. These questions omit facts that are important to resolving the instant motions (e.g., that the transaction was premised on the Loras' joint distribution capacity—not simply on Ruben's capacity—and the cooperators' visit to Rochester).

10. Unlike Levine, Cunniff had the opportunity to read all of the transcripts of the undercover tapes before reaching his conclusion. Cunniff served the DEA as a Special Agent in New England for over seventeen years. He has extensive experience investigating Colombian and Dominican cocaine networks. Significantly, he is also intimately familiar with business practices in the local cocaine market during the past ten years.

rest and prosecution of defendants under Title 21. *See* 21 U.S.C. § 853. Following several well-publicized stings where agents seized large amounts of cash, drug traffickers came to believe that only undercover agents required down payments so the government could confiscate the cash brought to a drug buy.

Based on this background knowledge, Cunniff concluded that a small down payment is not unusual for a wholesale cocaine transaction in the local domestic market. In his opinion, the Loras' agreement to make any down payment whatsoever, in addition to their offering alternative assurances of payment, underscored the seriousness of their intention to possess the cocaine shipment. In Cunniff's view, the negotiations between the government and the Loras yielded a transaction which accurately reflected transactions occurring in the real black market. In other words, the $27,000 down payment was not artificially low.

## IV. *SENTENCING ANALYSIS*

With respect to the Note 15 departure claim I must consider the following: First, whether a Note 15 departure may be available in reduction-of-down-payment cases generally, though the price per kilogram of cocaine is within market range; second, the appropriate standard to be applied under Note 15; and third, whether that standard, when applied to the Loras, requires a departure as to either defendant.

With respect to the other issues raised by the Loras: I find Angel deserves a four-level upward adjustment as an organizer of criminal activity involving five or more participants. U.S.S.G. § 3B1.1(a). I find Ruben qualifies for a three-level enhancement as a supervisor or manager.

U.S.S.G. § 3B1.1(b). I also depart down one offense level pursuant to U.S.S.G. section 5K2.0 because the three-level managerial adjustment significantly overstates Ruben's role given the unusual circumstances of this case.

### A. *Note 15 Departures*

#### 1. *Background to Note 15*

In the years following the enactment of the Guidelines, many federal courts expressed their discomfort with reverse-sting operations, a sentiment I share. *E.g.*, *United States v. Stavig*, 80 F.3d 1241, 1247 (8th Cir.1996) [hereinafter *"Stavig"*]; *United States v. Naranjo*, 52 F.3d 245, 250 (9th Cir.1995) [hereinafter *"Naranjo"*]; *United States v. Cambrelen*, 29 F.Supp.2d 120, 125–26 (E.D.N.Y.1998) [hereinafter *"Cambrelen"*]. Where drug sentences are driven primarily by the type and quantity of drugs, the potential exists for the government, not the court, to effectively dictate the defendant's ultimate sentence. Law enforcement agents are in a position to decide when (i.e., after how many drug transactions) to arrest the defendant. The agents, therefore, can fix the amount of drugs, and even the kind of drugs,[11] that will be attributed to her. In the case of a reverse sting, where the government supplies the drugs, the potential for abuse of the government's discretion is even greater. This is especially so where the drug deal is put together by confidential informants rather than field agents. Informants seeking a reduction in their own sentences through substantial government assistance, often have incentives to arrange large-scale transactions, and to encourage defendants to accept large amounts of drugs. *Stavig*, 80 F.3d at 1247.

---

11. For example, in *United States v. Shepherd*, the undercover agent insisted that the defendant cook the powder cocaine—making it into crack cocaine—before the agent would purchase the cocaine from the defendant. 857 F.Supp. 105, 110 (D.D.C.1994). The defendant's compliance with the agent's demand added five years to her sentence under the

Guidelines. *Id.* at 112. In an analogous reverse sting situation, an undercover agent encouraged defendants to buy a machine gun as well as handguns for the sole purpose of adding twenty-five years to the defendants' sentences. *United States v. Cannon*, 886 F.Supp. 705, 708 (D.N.D.1995), *rev'd on other grounds*, 88 F.3d 1495 (8th Cir.1996).

There are several approaches to the problem. Courts and commentators speak of both "sentencing entrapment" and "sentencing factor manipulation." [12] Sentencing manipulation and sentencing entrapment are court-created doctrines that, to a degree, address situations in which the government has acted improperly. In addition, Note 15 of the Guidelines carves out a third alternative basis for departure that focuses more on the defendant's predisposition.

Unlike some courts, the First Circuit uses the labels "sentencing entrapment" and "sentencing factor manipulation" interchangeably. [13] *United States v. Woods,* 210 F.3d 70, 75 (1st Cir.2000) [hereinafter *"Woods"*]. Under this approach to sentencing entrapment, like traditional entrapment, government misconduct must be found to have overborne the will of a defendant predisposed to commit a lesser crime than the one charged. *Id.; United States v. Connell,* 960 F.2d 191, 196 (1st Cir.1992) [hereinafter *"Connell"*]; *see also United States v. Staufer,* 38 F.3d 1103, 1106 (9th Cir.1994) [hereinafter *"Staufer"*]; *United States v. Lenfesty,* 923 F.2d 1293, 1300 (8th Cir.1991). (Traditional entrapment, of course, requires that the defendant not be predisposed to commit any crime.) The misconduct involved must be significant; sentencing entrapment is only available in "the extreme or unusual case." *Montoya,* 62 F.3d at 4. The defendant also must show lack of predisposition to engage in an offense of the magnitude for which she is being sentenced. *Woods,* 210 F.3d at 75.

Some courts and scholars, however, distinguish between sentencing factor manipulation and sentencing entrapment. *E.g., United States v. Jones,* 18 F.3d 1145, 1152–53 (4th Cir.1994); *United States v. Shephard,* 4 F.3d 647, 649 (8th Cir.1993). [14] Under this approach, sentencing factor manipulation may exist regardless of the defendant's predisposition. The doctrine focuses exclusively on the motives of law enforcement authorities in manipulating the sentence, as when an agent delays an arrest with the purpose of increasing the defendant's sentence. [15] *See Shephard,* 4 F.3d at 649. One commentator illustrated the distinction:

> An example of "sentencing entrapment" would be when a government agent offers a kilogram of cocaine to a person who has previously purchased only gram or "user" amounts, for the purpose of increasing the amount of drugs for which he ultimately will be held accountable. On the other hand, an example of

**12.** *See generally* Sandra Guerra, "The New Sentencing Entrapment and Sentence Manipulation Defenses," 7 Fed. Sentencing Rep. 181 (1995).

**13.** The First Circuit, however, clearly distinguishes between sentencing entrapment/manipulation departures, on the one hand, and Note 15 departures, on the other. *See United States v. Montoya,* 62 F.3d 1, 4–5 (1st Cir. 1995) [hereinafter *"Montoya"*]. By contrast, some circuits refer to Note 15 departures as departures for "sentencing entrapment." *E.g., Stavig,* 80 F.3d at 1246; *Naranjo,* 52 F.3d at 250. The First Circuit has adopted the better approach as the other circuits conflate different bases for departure. Thus, this memorandum characterizes the Loras' motions as seeking "Note 15 departures" as opposed to "sentencing entrapment" or "sentencing factor manipulation" departures.

**14.** The Eighth Circuit cited the First Circuit's decision in *Connell,* 960 F.2d at 194, to support this distinction. Subsequent to the *Connell* decision, however, the First Circuit fused the entrapment and manipulation doctrines. *See Woods,* 210 F.3d at 75.

**15.** Manipulation claims are difficult to prove because often there exists legitimate law enforcement purposes to stringing out the arrest. As one court indicated:

> [I]t is legitimate for police to continue to deal with someone with whom they have already engaged in illicit transactions in order to establish that person's guilt beyond a reasonable doubt or to "probe the depth and extent of a criminal enterprise, to determine whether coconspirators exist, and to trace the drug deeper into the distribution hierarchy."

*Shephard,* 4 F.3d at 649 (quoting *United States v. Calva,* 979 F.2d 119, 123 (8th Cir.1992)).

"sentencing manipulation" would be when an undercover agent continues to engage in undercover drug purchases with a defendant, thereby stretching out an investigation which could have concluded earlier, for the sole purpose of increasing the defendant's sentencing exposure, or when an undercover agent insists that a defendant "cook" powder cocaine into "crack," well-knowing that sentences for dealing in crack are significantly higher than sentences for dealing in powder cocaine.

Amy Levin Weil, "In Partial Defense of Sentencing Entrapment," 7 Fed. Sentencing Rep. 172, 174 (1995) (footnotes omitted). In any event, the sentencing entrapment and manipulation doctrines both require a finding of improper motive on the part of the government before a departure is warranted.

Note 15 of the Guidelines focuses less on the motives of the government, and more on the defendant's predisposition. Note 15 asks whether government conduct, regardless of motive, induced a defendant to purchase more drugs than she otherwise would have purchased. *See Montoya*, 62 F.3d at 5. The significance of Note 15 has been described as follows:

> [T]he Sentencing Commission now expressly recognizes that law enforcement agents should not be allowed to structure sting operations in such a way as to maximize the sentences imposed on defendants, and that courts may take into consideration the predisposition and ca-

pacity of the defendant to engage in a deal of the magnitude for which he or she was convicted.

*Staufer*, 38 F.3d at 1107.[16]

The Commission's approach here makes sense: The goal of sentencing is to impose punishments proportional to the defendant's culpability. Even if the agent has an entirely legitimate purpose in seeking to increase the amount of drugs (e.g., to get more drugs off the street, to "climb up" the distribution hierarchy to arrest more substantial dealers, etc.), the defendant's sentence should reflect her own culpability, her predisposition to commit an offense of the scope charged. *See* Guerra, *supra* note 12. Drug quantity may be an appropriate proxy for culpability in some cases. Plainly it should not be in others, where the quantity is largely not a product of the defendant's proclivities.

It is clear Note 15 departures are encouraged departures. *Cf. United States v. Cali*, 87 F.3d 571, 580 (1st Cir.1996) (finding section 3B1.1 departures "are clearly encouraged by the Commission" on the basis of language similar to the Note 15 language). But Note 15's proper scope and application remains largely unsettled.

### 2. *The Note 15 Standard*

■ The Loras carry the burden of satisfying a two-part test under Note 15.[17] U.S.S.G. § 2D1.1, cmt. n. 15; *United States v. Gaviria*, 116 F.3d 1498, 1527 (D.C.Cir.1997); *cf. Stavig*, 80 F.3d at

16. Note 15 is one of the few Guidelines provisions in which the Commission appears to be concerned with mens rea. *See generally* Jack B. Weinstein & Fred A. Bernstein, "The Denigration of Mens Rea in Drug Sentencing," 7 Fed. Sentencing Rep. 121 (1994).

17. Some cases suggest a court must make a third finding before a Note 15 departure is warranted: The government offered a lower down payment with an intent to increase the defendant's sentence. *E.g., Naranjo*, 52 F.3d at 251; *Cambrelen*, 29 F.Supp.2d at 125. Clearly, a court must find improper motive before it may find the government engaged in sentencing factor manipulation or sentencing entrapment. *Woods*, 210 F.3d at 75; *Montoya*, 62 F.3d at 4. The text of Note 15, however,

does not mention improper government motive. U.S.S.G. § 2D1.1, cmt. n. 15; *see also United States v. Searcy*, 233 F.3d 1096, 1101 (8th Cir.2000) (holding that sentencing entrapment analysis focuses on the defendant's predisposition, not the government's conduct, and noting that Notes 12 and 15 "never mention outrageous government conduct"). While the sentencing entrapment doctrine focuses on the government's misconduct, Note 15 focuses the court's inquiry on the defendant's conduct and criminal history. *Montoya*, 62 F.3d at 5. Thus, a court may grant a Note 15 departure without finding that the government engaged in misconduct. *Id.; Searcy*, 233 F.3d at 1101.

1246–47 (defendant carries the burden of proof). The first prong concerns the government: Did the government agents offer a below-market price, or other financial terms that were overly generous, beyond what the market would have provided in like circumstances? The second prong concerns the defendants: Did the overly generous financial terms lead them to purchase more cocaine than their available resources otherwise would have allowed them to purchase? U.S.S.G. § 2D1.1, cmt. n. 15; *Gaviria*, 116 F.3d at 1527.

### a. *Note 15's Application to Reduction-of-Down-Payment Cases*

■ The threshold question raised by the government is whether Note 15 applies to reduction-of-down-payment cases, as well as below-market price cases. I conclude that it does.

In *Montoya*, the FBI engaged in a reverse sting operation in which its undercover agent, Antonio Dillon [18] ("Dillon"), posed as a high-volume wholesaler of cocaine seeking new distributors. *Montoya*, 62 F.3d at 2. At the first negotiation session with the Montoya brothers, Dillon required a minimum purchase of ten kilograms, with a down payment equal to the value of three kilograms, and repayment of the balance within fifteen to twenty days after delivery. *Id.* After subsequent meetings, the Montoya brothers pled a shortage of cash and Dillon reduced the down payment to $25,000 for ten kilograms. *Id.* After the first ten kilograms were delivered, the defendants were arrested.

At sentencing, the defendants did not claim that the $17,000 price was below the market price. Instead, like the Loras, they argued that the government manipulated the quantity upward by reducing the

down payment from $50,000 to $25,000. *Id.* at 3. Based on Dillon's original proposal of a down payment equal to three kilograms (i.e., $51,000), the defendants urged the court to find each defendant liable for only three or four kilograms, rather than the full ten kilograms they received. The district court rejected their argument, finding the defendants were predisposed to purchase ten kilograms, and that they could, and did, purchase this amount. *Id.* The court then imposed the mandatory minimum ten-year sentence under 21 U.S.C. § 841(b)(1)(A).

The First Circuit affirmed, concluding that there was no evidence of an illegitimate motive on the part of the government. At the same time, the court emphasized that a district court may grant a discretionary departure "on something less than extraordinary [government] misconduct." *Montoya*, 62 F.3d at 4–5. The Commission made this clear for at least "one narrow class of conduct" by enacting Note 15.[19] *Id.* at 5. While the sentencing entrapment doctrine focuses on the government's misconduct, the Guidelines, and Note 15 in particular, "are centrally concerned with a proper sentence for the defendant in light of his own conduct and his own criminal history." *Id.*

Of special note, the *Montoya* court acknowledged that departures may be warranted in circumstances *analogous* to those described by Note 15—"although not literally within this application note—assuming that the general precepts for downward departures were met."[20] *Id.* (citing U.S.S.G. § 5K2.0, which authorizes departures if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the

---

**18.** Dillon supervised the Lora sting operation as well.

**19.** At the time *Montoya* was decided, the text now found in Note 15 was designated as application note 17.

**20.** The application of Note 15 to analogous cases makes sense for another reason, apart from the general departure authority: This is

an application note, not a guideline, and thus, it explains just one of the ways section 2D1.1 is to be applied. To be sure, the Supreme Court in *Stinson v. United States*, held that an application note is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with the Guidelines themselves. *See* 508 U.S. 36, 38, 42–43, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) (interpreting

Sentencing Commission in formulating the guidelines"). In effect, the *Montoya* court predicted the potential application of Note 15 to cases like the instant one.[21]

Note 15 expresses the Commission's concern that the government, via its position as the seller of drugs, may induce a defendant to purchase more drugs than the defendant intended to purchase by offering the defendant unusually generous terms. *Staufer*, 38 F.3d at 1107. The relevant question, then, is not simply whether the price per kilogram was artificially low, but whether the government's financial terms in general were artificially

generous, or otherwise unrepresentative of market practices.

Thus, I must consider all terms of the transaction including the down payment, credit, and repayment arrangements. *See Cambrelen*, 29 F.Supp.2d at 125. I must also look to factors other than the defendant's ability to produce a cash down payment on delivery. It may be entirely reasonable for a seller to evaluate a defendant's ability to distribute substantial quantities of drugs post-delivery, or make future payments, especially in cases involving mid and upper-level drug traffickers. *See Stavig*, 80 F.3d at 1246; *United*

U.S.S.G. § 4B1.2, cmt. n. 2). The application notes function like an administrative agency's interpretation of its own legislative rules. *Id.* at 44, 113 S.Ct. 1913. The Guidelines are the equivalent of legislative rules adopted by federal agencies. The functional purpose of the Guidelines' commentary "is to assist in the interpretation and application of those rules, which are within the Commission's particular area of concern and expertise. . . ." *Id.* at 45, 113 S.Ct. 1913.

Of course, application notes are not reviewed with the same precision as the legislative rules of other agencies. *United States v. Juan*, 59 F.Supp.2d 210, 214 n. 10 (D.Mass. 1999). Like the Guidelines themselves, the application notes have no legislative history, and the formal requirements of the Administrative Procedure Act do not apply. *See* 28 U.S.C. § 994(x). Unlike the Guidelines, however, application notes may be added without Congressional review. *See* 28 U.S.C. § 994(p); *Stinson*, 508 U.S. at 46, 113 S.Ct. 1913.

Moreover, the analogy to the interpretation of legislative rules is somewhat misplaced when applied to Note 15. Note 15 does not interpret a guideline dealing with this issue—the relative roles of the defendant's predisposition versus the government's conduct—at all. It interprets a guideline dealing with various objective offense characteristics—quantity, the presence or absence of a gun, etc. *Cf. Juan*, 59 F.Supp.2d at 216 (D.Mass. 1999) (construing U.S.S.G. § 2D1.1, application note 3).

21. Applying Note 15 generally, insofar as it illustrates the Commission's thinking in an area, is one thing. Applying it literally, within the confines of a particular case, is quite another. For example, in *Staufer*, the Ninth Circuit applied Note 15 to a regular sting, rather than a reverse Sting. *See* 38 F.3d at 1107–08. The court explained that while

Note 15 applied to only one type of transaction, Note 15 indicated the Commission's awareness of the "unfairness and arbitrariness" of allowing undercover agents to pressure defendants to purchase or sell larger quantities of drugs in order to increase their sentences. *Id.* at 1107.

In *Cambrelen*, the district court granted a Note 15 departure where the government's credit terms were extremely favorable, and not, strictly speaking, where agents offered a below-market price. *See* 29 F.Supp.2d at 125. There, the informant essentially sold cocaine to the defendants on consignment. *Id.* The informant told the defendants they could steal as many as eighty kilograms of cocaine from a warehouse where the informant worked, so long as the defendants paid the informant one-quarter of the amount realized on the defendants' ultimate sale of the cocaine. *Id.* In other words, the informant "fronted" cocaine to the defendants without a fixed repayment price.

Although Note 15's language did not appear to directly address the *Cambrelen* facts, the court departed because the facts were "comparable" to "the usual reverse sting case" covered by Note 15. *Id.* The Court noted:

An analogy to Note 15, a modest attempt to deal with an acute problem, does not require this court to set the base-level calculated solely on the amount of drugs actually in the warehouse or believed by defendants to be there, but allows a downward departure in an appropriate case. While the Note addresses a reverse sting situation, there is no good reason why the court should not regard the Note as authorizing by analogy the power to depart where the government agent has led the defendant to steal drugs rather than to buy drugs.

*Cambrelen*, 29 F.Supp.2d at 126.

*States v. Cotts,* 14 F.3d 300, 307 (7th Cir. 1994).[22] In that regard, it would not be unreasonable, as both Levine and Cunniff testified, for a purchaser to give the following kinds of assurances: (a) Proving to suppliers the defendant's capacity to distribute large quantities of drugs through her established trafficking network; (b) pledging legitimate businesses or properties to be made accessible to the supplier in the event of default; (c) requiring another trusted trafficker to vouch for the defendant; and/or (d) offering a hostage to be held until the defendant makes full repayment.

### b. *The Defendant's Resources and Predisposition*

As far as predisposition is concerned, the First Circuit found the following factors were salient in *Montoya:*

**22.** With respect to credit arrangements, the *Cotts* court noted:
> [I]n transactions in which the defendant is working as a mid-level distributor and drugs are to be fronted to him with the understanding that payment will be forthcoming from the proceeds of subsequent sales, a lack of cash on hand does not indicate an inability to purchase the negotiated amount. So long as the defendant working as a middleman genuinely intends to engage in such a pay-later transaction, his lack of currently available funds is irrelevant.

14 F.3d at 307 (citations omitted). For two reasons, the Seventh Circuit's reasoning that a lack of funds is "irrelevant" in mid-level drug trafficking cases is inapposite to the Loras' case. First, the *Cotts* decision addressed a claim brought under U.S.S.G. section 2D1.1, application note 12 ("Note 12"), not Note 15. The text of Note 12 reads:
> In an offense involving an agreement to sell a controlled substance, the agreed-upon quantity of the controlled substance shall be used to determine the offense level unless the sale is completed and the amount delivered more accurately reflects the scale of the offense. For example, a defendant agrees to sell 500 grams of cocaine, the transaction is completed by the delivery of the controlled substance—actually 480 grams of cocaine, and no further delivery is scheduled. In this example, the amount delivered more accurately reflects the scale of the offense. In contrast, in a reverse

This case involves a single transaction, not a string of crimes prolonged by the government; the price was within the market range; and the appellants by their own recorded admissions were well established drug dealers or abetters who had previously dealt in very substantial quantities.

*Montoya,* 62 F.3d at 4. Likewise, in *Woods* (not addressing Note 15, but considering predisposition), the court found no sentencing entrapment notwithstanding Woods' argument that the low price of $15,000 per kilogram was well below the market price of $24,000, and that the credit arrangement persuaded him to purchase more than he otherwise would have purchased. *Woods,* 210 F.3d at 75. The First Circuit found: (1) The agent did not pressure Woods to accept the deal; (2) Woods

> sting, the agreed-upon quantity of the controlled substance would more accurately reflect the scale of the offense because the amount actually delivered is controlled by the government, not the defendant. If, however, the defendant establishes that he or she did not intend to provide, or was not reasonably capable of providing, the agreed-upon quantity of the controlled substance, the court shall exclude from the offense level determination the amount of controlled substance that the defendant establishes that he or she did not intend to provide or was not reasonably capable of providing.

The Loras' do not present a Note 12 claim. (Note 12 would be relevant to the instant case only if the Loras claimed that they should not be held responsible for sixty-five kilograms because the government delivered fifty-one kilograms at the warehouse. Note 12 provides, then, that sixty-five kilograms should be used to calculate the Guidelines offense level because that is the amount the Loras agreed to buy.)

Second, to the extent that *Cotts* can be read as saying "a lack of currently available funds is irrelevant" under Note 15, I must reject that notion. Note 15 addresses concerns that the government, via its position as seller, can manipulate the financial terms of a drug deal to increase the defendant's exposure at sentencing. Clearly, a defendant's available funds are an important consideration in light of Note 15's purpose and text.

was eager to receive the additional two kilograms on credit, and he indicated that he would pay the agent back shortly; (3) Woods' taped admissions showed he was an established drug dealer who had previously handled substantial quantities; and (4) Woods expressed his intent to regularly purchase five kilograms or more from the agent. *Id.* Indeed, the agent, rather than ratcheting up the drug quantity, ultimately refused Woods' request to purchase five kilograms. *Id.* at 76.

Thus, in determining whether the defendant lacked the predisposition and available resources to commit the crime charged, I should consider not just the defendant's cash on hand, but also: (a) The non-monetary security offered by the defendant to complete the deal (e.g., Woods allowed an informant to stay at Woods' home until Woods repaid the supplier); (b) the defendant's history of, and capacity for, dealing in substantial quantities of the drug (e.g., the Montoyas' admissions that they were established drug dealers); and (c) the defendant's expressed intention to engage in future dealings of a similar size or scale (e.g., the Montoyas' hope that the deal would be the first of many).

### 3. *Application of Note 15 to the Loras*

■ Based on the facts presented here, both Ruben and Angel are unable to meet their burden under the Note 15 standard. Considering all the circumstances, I find the government did not offer the Loras artificially favorable credit terms. I also find the Loras did not purchase more cocaine than their available resources would have allowed but for the favorable credit terms. Accordingly, no departures are warranted in this instance.

### a. *The Price of the Cocaine*

As an initial matter, the Loras bargained for a price of $17,500 per kilogram,

which was well within market range by all accounts. The Loras agreed to pay the agents a total of $1,137,500, not simply a $27,000 down payment. The government agreed to front the cocaine to the Loras for a period of fifteen days. This is not an unusual practice, even according to the Loras' expert, so long as the Loras provided the government with other reasonable assurances of repayment.

Here, the $27,000 down payment constituted only a portion of the security pledged by the Loras. The informants actually took additional steps to ensure repayment in lieu of a large down payment.[23]

First, the informants negotiated under the pretense that another drug dealer, Mendez, vouched for Ruben. The informants repeatedly told Ruben that they trusted Mendez's word that Ruben was a good customer. Later, CW1 vouched for the Loras when Dominguez expressed concerns about the Loras' legitimacy on the day of delivery.

Second, the Loras' invited the informants to spend a weekend with the Loras in Rochester, New York, as a means of earning the informants' trust. The informants actually did visit the Loras' properties, homes, and families before agreeing to a deal. In so doing, the Loras assured the informants the brothers would not flee with the informants' property because the informants now knew where the Loras lived and worked. Moreover, the informants would be able to recoup some of their losses should the Loras' default on the obligation to repay the value of the cocaine.

Third, the Loras provided the government with details of the Loras' drug trafficking activities in order to demonstrate their genuine ability to distribute sixty-five kilograms. For example, Ruben indicated that he sold heroin from his night club,

---

23. As discussed earlier, Levine testified that legitimate cocaine wholesalers would take several steps to ensure repayment by a new client in lieu of a large down payment. I find that the government actually took two or more of the steps outlined by Levine.

which CW1 visited. Ruben allowed CW1 to see his heroin partners counting cash at Ruben's home. Ruben disclosed that he laundered drug proceeds through the night club as well. Also, Ruben informed CW1 that Ruben distributed his cocaine in Providence, not Rochester.

Angel provided similar details of his drug trafficking network: Angel used Luis to collect money from Angel's customers and to deliver money to Angel's suppliers. Sabrina laundered funds and shipped them out of the United States. Angel owned a laundry and an apartment complex to serve as legitimate fronts for his illegal business. Angel repeatedly assured the government agents he had several clients who could take fifty kilograms or more immediately. He indicated that his clients lived in various states and Canada. Angel's business was so vast he often drove thousands of miles to make deliveries and collect profits. Finally, Angel owned at least two vehicles with sophisticated "hides" to transport multi-kilogram quantities.

In sum, the Loras negotiated around the down payment requirement by proving they were successful mid-level distributors, with legitimate businesses to launder funds, and families and homes that would be threatened if they failed to uphold their end of the bargain. In light of these circumstances, I find the government agents did not offer the Loras an artificially low down payment for sixty-five kilograms.

I am persuaded by the testimony of the government's witness on this point as well. Cunniff reported that in New England, mid-level cocaine traffickers typically do not require large down payments (e.g., one-third to one-half of total cost), due, at least in part, to the asset forfeiture laws. Drug traffickers perceive unacceptable risk in carrying large amounts of cash to a drug buy. If the deal turns out to be a sting, as it did here, the government will confiscate the money brought to the deal. So long as the Loras convinced a drug wholesaler of their trustworthiness and

ability to pay later, the typical wholesaler would not demand a large down payment. Thus, the $27,000 down payment was not artificially generous.

### b. *The Loras' Ability and Intention to Purchase Sixty–Five Kilograms*

Even were the government's down payment requirement artificially low, the government's credit terms did not induce the Loras to purchase more drugs than the Loras' available resources otherwise would have allowed. The Loras' joint distribution capacity, and other resources discussed above, enabled them to conduct business on this scale without offering a large down payment. Moreover, the Loras were predisposed to buy sixty-five kilograms or more before the government agents entered the picture. The informants originally proposed a transaction involving a much smaller quantity of cocaine. The Loras, primarily driven by Angel's demands, drove the quantity up from that original proposal.

Ruben's taped admissions revealed his prior dealings with Mendez involved as many as twenty to thirty kilograms. In addition, Ruben admitted to distributing several kilograms in the days preceding the initial meeting with the informants. Ruben backed up these assertions when the informants visited his home and nightclub in Rochester. Thus, the bargaining sessions progressed with the understanding that Ruben previously dealt in large wholesale quantities, and that he would be responsible for distributing only fifteen of the sixty-five kilograms.

Angel bought the bulk of the cocaine. Angel demonstrated to the informants that he could, and did, regularly distribute much larger quantities of cocaine than Ruben. Moreover, Angel owned a home, an apartment complex, and a laundry, through which he laundered drug proceeds. He also owned several vehicles with secret compartments for transporting large quantities of drugs.

The reduction of the down payment did not lead the Loras to purchase more cocaine than their available resources otherwise would have allowed. Rather, their joint capacity to distribute sixty-five kilograms enabled them to purchase that amount with little or no down payment.

Finally, unlike in *Cambrelen,* 29 F.Supp.2d at 125, there is no evidence here that the Loras lacked the predisposition to purchase sixty-five kilograms. Just the opposite is true. CW1 repeatedly told the Loras' to accept a smaller quantity of cocaine—as little as fifteen kilograms—to start. At the behest of Angel, the brothers refused to accept less than sixty-five kilograms. They pushed for a much larger quantity throughout, with an eye to regularly buying as many as 100 to 200 kilograms on a biweekly basis.

■ To be sure, Ruben stands in a different position vis à vis the government than does Angel. But while I agree with Ruben on several points, they do not affect the outcome under Note 15. I acknowledge that the government informants pressured Ruben to "work" with them. The informants used a troubling tactic: They used Ruben's debt to a large Colombian trafficking organization to play upon his fear of retaliation.[24] The informants also pressured Ruben to seek the assistance of his friends when Ruben indicated he did not have the resources to buy drugs from the informants to pay off his debt.

Although Ruben did not possess the resources, acting alone, to bargain for sixty-five kilograms of cocaine, and at the outset, had no intention of purchasing that quantity, he was the one who facilitated his brother Angel's entry into the negotiations.[25] Angel plainly had the capacity to engage in such a large transaction. Ruben never objected or withdrew once he set the ship to sail with Angel at the helm.

From the transcribed conversations, it is clear that once Ruben joined the game, he was a willing and eager player. Despite the fact that Ruben endured some pressure from both the government and his brother, Ruben will be held responsible for the quantity of cocaine that he jointly undertook to purchase with Angel. U.S.S.G. § 1B1.3(a)(1).[26] To the extent adjustments should be made they will be directed at the relative roles performed by each brother.

### B. *Adjustments for Aggravated Roles in the Offense*

The government and the Probation Office recommend that I assess both Loras four-level leadership enhancements for their aggravating roles in the offense. U.S.S.G. § 3B1.1(a) (providing for a four-level upward adjustment "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive"). I accept this recommendation with respect to Angel, but I find Ruben should be assessed a three-level managerial enhance-

---

**24.** Such tactics have provoked other judges to condemn the use of reverse stings altogether as violative of due process rights. *E.g., United States v. Hulett,* 22 F.3d 779, 782 n. 3 (8th Cir.1994) (Heaney, J.) ("In my view, the reverse sting not only violates due process but also leads to corruption within the government itself.").

**25.** Indeed, Ruben had not been "picked" by the government out of the blue. He owed $18,000 to Mendez for past multiple-kilogram cocaine purchases *before* CW1's contact. An independent investigation had identified both brothers as high level dealers. Ruben initiated the informants' visit to his home and night club. Significantly, it was Ruben, not

the informants, who originally upped the ante—from five or six kilograms to thirty or thirty-five kilograms—and introduced CW1 to Angel.

**26.** The Guidelines provide:

> With respect to offenses involving contraband (including controlled substances), the defendant is accountable for all quantities of contraband with which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook.

U.S.S.G. § 1B1.3, cmt. n. 2 (2000).

ment only. I also grant Ruben a one-level departure pursuant to U.S.S.G. section 5K2.0 because the managerial enhancement significantly overstates Ruben's culpability.

### 1. *Standard for Aggravating Role Adjustments*

The Guidelines punish the persons atop the criminal pyramid more severely based on their relative responsibility. *United States v. Tejada–Beltran,* 50 F.3d 105, 111 (1st Cir.1995). The Commission drafted U.S.S.G. section 3B1.1 to provide "a range of adjustments to increase the offense level based upon the size of a criminal organization (i.e., the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense." U.S.S.G. § 3B1.1, cmt. background.

For criminal activity involving five or more participants, subsection 3B1.1(a) requires a four-level increase for an "organizer or leader" and subsection 3B1.1(b) requires a three-level increase for a "manager or supervisor." For defendants acting as "organizer, leader, manager, or supervisor" in any criminal activity other than those described in subsections 3B1.1(a) and (b), subsection 3B1.1(c) requires a two-level increase.

Both the "organizer or leader" adjustment, authorized by subsection 3B1.1(a), and the "manager or supervisor" adjustment, authorized by 3B1.1(b), require the Court to make two determinations—a scope determination and a status determination. As to scope, the Court must find the defendant's criminal activity involved five or more participants or was otherwise extensive. As to the defendant's status, the Court must distinguish the top leadership or organizational roles from other, less culpable, managerial or supervisory roles.

The lines the Commission has drawn between these various roles, however, are hardly clear. As one court noted, the Commission did not intend the section 3B1.1 analysis "to devolve into a hollow exercise in spatial geometry." *United States v. Graham,* 162 F.3d 1180, 1185 (D.C.Cir.1998). Rather, the Commission designed section 3B1.1 to distinguish between defendants based on "relative responsibility," [27] and the Commission has provided a list of substantive factors to assist courts in applying the guideline:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, cmt. n. 4. At the same time, the case law concerning these factors is filled with words of limitation: No one factor is dispositive, and the factors cannot be read "to create a formulaic sentencing methodology." *Graham,* 162 F.3d at 1185; *see also United States v. Cali,* 87 F.3d 571, 578 (1st Cir.1996) (list of seven factors "is

---

27. Plainly, this is an area in which the court can consider relative culpability, i.e., where a given defendant stands relative to her codefendants. The background commentary refers explicitly to "relative responsibility."

How then to reconcile this guideline with the admonition that trial courts cannot depart "to equalize sentencing outcomes for similarly situated codefendants." *United States v. Kneeland,* 148 F.3d 6, 16 (1st Cir.1998). The only way to do so is as follows: If the Court has sentenced one defendant, and based on

the facts before the Court has concluded that a role adjustment is not proper, the Court may not then decline to make that adjustment in a second case where the Court now believes the facts call for it. *See id.* at 16; *United States v. Wogan,* 938 F.2d 1446, 1448–49 (1st Cir.1991). In effect, the Court cannot compound an earlier error just to equalize sentences of codefendants.

Here, both defendants are before me. Surely I can make a determination of relative responsibility as between the two.

neither exhaustive nor imbued with 'talismanic significance' ").[28]

Moreover, the application notes suggest that these are not formal factors, but rather functional categories. Application note 2, for example, suggests that a defendant can be an organizer, leader, etc., even if she did not supervise another participant, but she exercised managerial responsibility over the "property, assets or activities of a criminal organization." U.S.S.G. § 3B1.1, cmt. n. 2.

A defendant may be classified as an organizer, though perhaps not as a leader, if he coordinates others "so as to facilitate the commission of criminal activity."[29] *Tejada–Beltran*, 50 F.3d at 112. The key to determining whether the organizer label applies "is not direct control but relative responsibility." *Id.*

Under subsection 3B1.1(b), a defendant must exercise some degree of control or organizational authority over others before supervisory or managerial status attaches. *United States v. Voccola*, 99 F.3d 37, 44 (1st Cir.1996). A defendant qualifies as a manager or supervisor if there is evidence that the defendant exercised control over, or was otherwise responsible for overseeing the activities of, at least one other person. *Id.*

### 2. *Angel Lora's Role in the Offense*

■ Angel can be fairly characterized as an organizer of criminal activity involving five or more participants. U.S.S.G. § 3B1.1(a). The instant offense involved at least six participants: (1) Angel; (2) Ruben; (3) Luis; (4) Rojas; (5) Conde; and (6) Sabrina. Moreover, Angel's role exhibits many of the "responsibility" factors enumerated by the Commission. U.S.S.G. § 3B1.1, cmt. n. 4.

When Angel entered the negotiations, he assumed ultimate decision-making authority on the Loras' end. For example, at the Olive Garden meeting with CW1, Angel vetoed Ruben's proposal that the Loras purchase thirty or thirty-five kilograms rather than fifty or more kilograms. Angel claimed right to a larger share of the profits because he assumed responsibility for distributing fifty of the sixty-five kilograms of cocaine. Also, Angel recruited Luis, Sabrina, and Conde to participate and exercised control over them. For example, Angel directed Luis to drive one of the vans to pick up the cocaine on the day of delivery. Angel indicated that he would later send Luis to carry money to the agents.

Finally, Angel planned a great deal for the instant offense. He invited the informants to his home to display his properties and businesses. He collected the $27,000 down payment. On the day of delivery, Angel brought several people and vehicles to assist him in transporting the cocaine.

---

**28.** The next guideline, section 3B1.2 (dealing with "mitigating roles"), speaks in terms of adjustments for a defendant who plays a part in an offense that makes her "substantially less culpable than the average participant." U.S.S.G. § 3B1.2, cmt. background. The term "average" suggests courts are to consider not just the facts of this case, but compare those facts more broadly to typical cases. Presumably, the reason for this is to limit the government's ability to determine a defendant's role just by the way in which the crime is charged—who is included within the indictment, and who is not.

While there is no similar language in section 3B1.1 dealing with "aggravating roles," the rationale should be the same under both guidelines. As the Seventh Circuit observed, "[o]ne's status as a middleman in a drug distribution chain does not, standing alone, make one a manager or supervisor." *United States v. Thompson*, 944 F.2d 1331, 1349 (7th Cir.1991) (citing *United States v. Fuller*, 897 F.2d 1217, 1220–21 (1st Cir.1990)). Such a person may be able to obtain a large quantity of drugs, but she may not be supervising one or more persons, or be high up on the distribution ladder. *Id.*

**29.** In the First Circuit, it remains open as to what minimally qualifies a defendant for the "leader" label under subsection 3B1.1(a). *See Tejada–Beltran*, 50 F.3d at 112 n. 7. I do not resolve that issue here as Angel exercised sufficient managerial and organizational control to qualify as an "organizer."

### 3. Ruben Lora's Role in the Offense

■ Ruben is most accurately characterized as a manager or supervisor in the cocaine conspiracy. U.S.S.G. § 3B1.1(b). Without Ruben, the transaction would never have occurred. Ruben took the informants' initial bait, and then recruited Angel to participate. Once serious negotiations started, however, Ruben, although he continued to participate, lost control and deferred to Angel's authority.

Angel exercised ultimate authority for two reasons: (1) Angel was the larger drug dealer of the two brothers; and (2) Ruben was incapable of proceeding without Angel due to Ruben's insolvency.

By the date of delivery, the brothers essentially supervised two different teams. Ruben led his own party, which would distribute Ruben's fifteen kilograms. Angel led a considerably larger party, which would distribute Angel's fifty kilograms. Unlike Angel, Ruben supervised only one person, Rojas. Ruben recruited Rojas to assist Ruben with pick-up and delivery of the cocaine. Ruben's role in the offense, particularly his status relative to Rojas, and his position as the brother of the leader, warrants a three-level upward adjustment under subsection 3B1.1(b).

### 4. Departure for Relative Responsibility

■ This role adjustment, however, does not entirely fit the facts here. While Ruben exercised some leadership, his position was anomalous. He was caught between a rock and a hard place. Ruben owed the Columbian organization an $18,000 debt which he felt he had to honor. Ruben stated to the Court, and I credit the statement, that he feared retaliation if he did not pay the money. On the other hand, once he agreed to participate—knowingly and willingly—he was swept along to ever higher quantities, not by

government importuning, but by Angel, who needed a new wholesale supplier. Ruben did not intend to purchase sixty-five kilograms for himself, before Angel joined. He agreed to a crime of this scope because Angel demanded it. In a fundamental sense revealed by the undercover tapes, Ruben did not know how large Angel's operation had become.

Moreover, while he played a somewhat aggravated role, it was much smaller than Angel's role. Indeed, the government admits that Ruben essentially organized only his own team, consisting of himself and Rojas, while Angel supervised the rest (i.e., Luis, Conde, and Sabrina). In the hierarchy, Ruben's relative culpability falls somewhere between Rojas and Luis, each of whom received five years, and Angel, who received seventeen and one half years.

The First Circuit has held that section 3B1.1 gives me three choices and three choices only: A four point increase, for organizer/leader; a three point increase for manager/supervisor; or no enhancement at all.[30] *United States v. Gonzalez–Vazquez*, 219 F.3d 37, 44 (1st Cir.2000). None of those options fit Ruben.

Section 5K2.0 gives me the authority to depart from the Guidelines in an atypical case, "if the court determines that, in light of unusual circumstances, the weight attached to that factor under the guidelines is inadequate or excessive." Such is the case here. Section 3B1.1 places disproportionate weight on Ruben's relative responsibility. Accordingly, I depart down one level to reflect Ruben's unusual situation. U.S.S.G. § 5K2.0.

### V. CALCULATION OF SENTENCES

#### A. Angel Lora

#### 1. Base Offense Level

Angel pled guilty to two counts charging him with violations of 21 U.S.C. §§ 846,

---

**30.** The Second Circuit also gave section 3B1.1 this interpretation in *United States v. Cotto*, 979 F.2d 921, 923 (2d Cir.1992). It is curious that the aggravating role guideline should offer only these choices, while the mitigating role guideline, section 3B1.2, offers a compromise outcome in cases "falling between" minimal and minor participation. *Compare* U.S.S.G. § 3B1.1, *with* U.S.S.G. § 3B1.2. These two guidelines seem to address two sides of the same coin.

841 and 18 U.S.C. § 2. Pursuant to U.S.S.G. section 3D1.2, these counts are grouped together. The guideline for both counts sets a base offense level of thirty-six (for at least fifty but less than 150 kilograms of cocaine). U.S.S.G. § 2D1.1(c)(2).

### 2. *Role Adjustment*

Angel qualifies as an organizer of the instant offense. Accordingly, I adjust the offense level upward four levels to level forty. U.S.S.G. § 3B1.1(a).

### 3. *Acceptance of Responsibility Adjustment*

Angel receives a downward adjustment of three levels for his acceptance of responsibility because he entered a timely guilty plea and allowed the government to avoid preparation for trial. U.S.S.G. § 3E1.1.

### 4. *Total Offense Level*

Angel's total offense level, therefore, is thirty-seven.

### 5. *Criminal History*

Angel has no criminal record. He falls into Criminal History Category I. U.S.S.G. ch. 5, pt. A.

### 6. *Departures*

I find no departure is warranted under Note 15, or for any other reason. I sentence Angel to a term of imprisonment within the guideline range.

### 7. *Sentence*

For offense level thirty-seven and Criminal History Category I, the range of incarceration is 210 to 262 months. U.S.S.G. ch. 5, pt. A. Apart from his criminal activity, Angel has maintained strong family ties and shouldered significant family responsibilities. He also has a record of legitimate employment during his years in the United States. Accordingly, I will sentence Angel to the bottom of the Guideline range at 210 months.

### B. *Ruben Lora*

### 1. *Base Offense Level*

Ruben pled guilty to two counts charging him with violations of 21 U.S.C. §§ 846, 841 and 18 U.S.C. § 2. Both counts are grouped together for sentencing purposes. U.S.S.G. § 3D1.2. Ruben is responsible for conspiring to possess, and aiding and abetting the possession of, at least fifty but less than 150 kilograms of cocaine. Therefore, Ruben's base offense level is thirty-six. U.S.S.G. § 2D1.1(c)(2).

### 2. *Role Adjustment*

Ruben qualifies for a three-level upward adjustment for his managerial role in the offense. U.S.S.G. § 3B1.1(b).

### 3. *Acceptance of Responsibility Adjustment*

Ruben receives a downward adjustment of three levels for his acceptance of responsibility because he entered a timely guilty plea and allowed the government to avoid preparation for trial. U.S.S.G. § 3E1.1.

### 4. *Total Offense Level*

Ruben's total offense level is thirty-six.

### 5. *Criminal History*

Ruben has one prior conviction for disorderly conduct. He did not receive a term of probation or imprisonment for that offense. The Guidelines provide that the Court should not count convictions of this sort unless the defendant received "a term of probation of at least one year or a term of imprisonment of at least thirty days, or [ ] the prior offense was similar to an instant offense." U.S.S.G. § 4A1.2. Thus, the prior conviction is not counted for criminal history purposes. Ruben falls into Criminal History Category I. U.S.S.G. ch. 5, pt. A.

### 6. *Departures*

I find no departure is warranted under Note 15. Given the unusual facts of this case and my concerns about Ruben's relative responsibility, however, I find the three-level aggravated role adjustment significantly exaggerates Ruben's culpability. Therefore, I depart down one offense level from level thirty-six to level thirty-five. U.S.S.G. §§ 5K2.0, 3B1.1, cmt. background.

### 7. *Sentence*

For offense level thirty-five and Criminal History Category I, the guideline range of incarceration is 168 to 210 months. U.S.S.G. ch. 5, pt. A. Like Angel, Ruben has maintained strong family ties and shouldered significant family responsibilities throughout his adult life. Ruben also has a record of legitimate employment before and after he immigrated to the United States. For these reasons, I sentence Ruben to the bottom of the Guideline range at 168 months.

## VI. *CONCLUSION*

For the reasons stated above, the Loras' motions for downward departures are **DE-NIED.** I sentence Angel to the bottom of the applicable guideline range, 210 months' incarceration. I depart down one offense level to ameliorate the excessive weight subsection 3B1.1(b) places on Ruben's aggravated role in the offense. U.S.S.G. § 5K2.0. Taking into account this departure, I sentence Ruben to 168 months' incarceration. The time the Loras have spent in pretrial detention shall count against their sentences.

**SO ORDERED.**