# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 04-1537

———————

United States of America,          *
                                   *
          Plaintiff - Appellee,    *
                                   *  Appeal from the United States
     v.                            *  District Court for the Southern
                                   *  District of Iowa.
Delton Lamon Alexander,            *
                                   *
          Defendant - Appellant.   *
                                   *

———————

Submitted:  November 15, 2004

Filed:  June 3, 2005 (Corrected: 06/14/05)

———————

Before MURPHY, HANSEN, and MELLOY, Circuit Judges.

———————

MELLOY, Circuit Judge.

     Defendant-Appellant Delton Alexander appeals his conviction for conspiracy to distribute methamphetamine and the attribution of twelve pounds of methamphetamine to him for sentencing purposes. 21 U.S.C §§ 846, 841(a), and 841(b)(1)(B)(viii).

In the fall of 2002, Captain David Henderson of the Johnson County Iowa Drug Task Force interviewed Brooke Walton. Walton identified a person involved in the distribution of drugs in and around Johnson County. Walton knew this person as "Cholo." In court Walton identified Macedonio Castillo Hernandez as "Cholo."

At the direction of law enforcement, Walton arranged for Special Agent Chuck Pettrone of the Iowa Division of Narcotics Enforcement to meet with Hernandez in an effort to purchase methamphetamine. On March 12, 2003, Hernandez agreed to distribute two ounces of methamphetamine to Pettrone in exchange for $1,700. At their meeting, Hernandez introduced Pettrone to Raul Munoz Lopez, also known as Tony Zuniga. Hernandez requested that Pettrone deal directly with Lopez in the future. During Pettrone and Lopez's initial conversation, Lopez asked Pettrone if he was a police officer. Despite his concerns that Pettrone was affiliated with law enforcement, Lopez eventually distributed two ounces of methamphetamine to Pettrone.

On March 19, 2003, Lopez sold Pettrone three more ounces of methamphetamine. On March 25, 2003, Lopez sold an additional pound of methamphetamine to Pettrone. In each of these ensuing transactions, Lopez became increasingly nervous and jittery, continually asking Pettrone if he was associated with law enforcement. Despite Lopez's growing concerns, Pettrone and Lopez began to negotiate the purchase of ten pounds of methamphetamine.

On April 3, 2003, Pettrone and another agent met with Lopez and an unknown black male to discuss future transactions. At the end of this meeting, law enforcement officials followed Lopez and the unknown male to the apartment of Delton Alexander.

On April 8, 2003, Pettrone spoke with Lopez over the telephone. Lopez was agitated and suspicious. Lopez asked to meet with Pettrone in person. Pettrone and

Lopez agreed to meet in the parking lot of a mall. Surveillance officers observed the meeting. They also audio- and videotaped the meeting. Before the meeting, the surveillance officers observed a blue Chrysler arrive at the mall. Delton Alexander was a passenger in the car. Alexander got out of the car and walked to the entrance of the mall. Alexander stood outside the entrance to the mall and watched the parking lot. Alexander did not ever enter the mall. According to Captain Henderson, Alexander stood approximately fifty yards from where Lopez and Pettrone met. During the meeting, Alexander appeared to be scanning the parking lot, focusing in particular on where Lopez and Pettrone were meeting. Just before the conclusion of the meeting, Alexander started to walk across the parking lot towards a McDonald's restaurant, scanning the parking lot as he walked. Following the meeting, Lopez picked up Alexander near the McDonald's.

After picking up Alexander, Lopez and Alexander approached one of the surveillance officers in the mall parking lot, Officer David Coffman. Coffman rolled down his window to speak to Lopez. Lopez told Coffman that he was driving a "cop's van." Lopez asked about the contents of the van and commented on the tinted windows. Based on this exchange, Coffman identified Alexander as the sole passenger in Lopez's vehicle. Alexander did not speak during the exchange.

Pettrone and Lopez continued to negotiate the purchase of more methamphetamine. Lopez agreed to deliver twelve pounds of methamphetamine to Pettrone on April 14, 2003. On April 14, Lopez drove a silver Chevy Prism to the prearranged location of the drug transaction. Earlier in the day, officers observed Alexander working on the undercarriage of the same car while it was parked by his apartment. Lopez had also been observed carrying a laundry basket from the apartment building to an orange Ford van in the apartment's parking lot that day. After placing the basket in the van, Lopez returned to the apartment building. Lopez delivered the twelve pounds of methamphetamine to Pettrone and Stapleton later that

day. Alexander was not present during this transaction, nor was he directly involved in any other transaction.

After Lopez's arrest, officers searched Alexander's apartment. Alexander was present at the time of the search. He had arrived at the apartment driving a gold car. The orange Ford van was in the apartment building parking lot at that time. Officers searched the car and the van. Investigators found two baggies of marijuana in the front seat area of the car. In a drawer next to the kitchen sink, investigators found a baggie that contained marijuana and a baggie of methamphetamine. Investigators found a glass tube used to smoke cocaine or methamphetamine on the floor of the bathroom and two digital scales commonly used to weigh controlled substances in the living room closet. In the orange van, investigators found a laundry basket containing four bags of marijuana, two bags of methamphetamine, a scale commonly used to weigh controlled substances, a drug ledger, and packaging material.

Alexander was interviewed by law enforcement at the residence. According to the police officer, Alexander stated that Lopez asked him to serve as a lookout, and that he had agreed to do so. The officer testified that Alexander was supposed to look for police or anyone else who might cause Lopez problems. If a problem arose, Alexander was to contact Lopez on his cellular telephone. Alexander also told the officer that he was present when Lopez confronted an individual in the mall parking lot.

On June 12, 2003, a federal grand jury returned a superseding indictment against Alexander. The indictment charged him with one count of conspiracy to distribute methamphetamine in violation of 21 U.S.C §§ 846, 841(a), and 841(b)(1)(B)(viii). At trial, Alexander testified in his own defense. Alexander denied making any admissions to the police officer regarding why he was at the mall. Alexander testified that he was not familiar with any of the items seized in his apartment on April 14, 2003. He denied acting as a lookout for Lopez. Alexander

testified that he went to the mall to obtain his apartment key from Lopez and to ask for a ride home. He stated that he went into the mall after observing Lopez meet with another individual in the parking lot and that he waited until the meeting between Lopez and Agent Pettrone was finished to ask for the key because he did not want to be involved in Lopez's conversation. Alexander asserted that he was unaware that Lopez used drugs or was involved in the distribution of drugs.

On October 3, 2003, the jury found Alexander guilty of one count of conspiracy to distribute methamphetamine and that the quantity of methamphetamine involved in the conspiracy was equal to or over fifty grams. On March 2, 2004, the district court[1] imposed a sentence of seventy-eight months. Alexander brings this timely appeal.

## I.

Alexander asserts that insufficient evidence supports his conviction for conspiracy to distribute methamphetamine. "The standard of review . . . is very strict." United States v. Sanders, 341 F.3d 809, 815 (8th Cir. 2003). We review "the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." Id. (quoting United States v. Espino, 317 F.3d 788, 792 (8th Cir. 2003)). We reverse the jury's verdict "only if no reasonable jury could have found [Alexander] guilty." United States v. Dabney, 367 F.3d 1040, 1042 (8th Cir. 2004).

---

[1] The Honorable Ronald E. Longstaff, Chief United States District Judge for the Southern District of Iowa.

"To establish that [Alexander] conspired to distribute [methamphetamine,] . . . the government must prove: (1) that there was a conspiracy, i.e., an agreement to distribute [methamphetamine]; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." Espino, 317 F.3d at 792. "A conspiracy need not be proved by direct evidence, it may be inferred from circumstantial evidence." United States v. Garrison, 168 F.3d 1089, 1095 (8th Cir. 1999). "Tacit understanding – as opposed to mere presence at and knowledge of an intended drug sale – will suffice; a formal agreement is unnecessary." Espino, 317 F.3d at 792. Furthermore, "[e]vidence of association or acquaintance, though relevant, is not enough by itself to establish a conspiracy." Id.

The evidence in this case supports the jury's finding that Alexander knowingly joined the agreement to distribute methamphetamine. A police officer, Officer Akers, testified that during his interview, Alexander stated Lopez asked him to serve as a lookout for the April 10, 2003 meeting with Pettrone. Akers also testified that Alexander said he was keeping an eye out for the police in particular as well as "anyone else who could cause [Lopez] problems." At trial, Alexander denied making these statements.

In considering the evidence, the jury weighed the conflicting testimony of Akers and Alexander. It determined that Officer Akers's testimony was more credible. We give significant weight to the jury's credibility determination. United States v. Meza-Gonzalez, 394 F.3d 587, 592 (8th Cir. 2004); Espino, 317 F.3d at 794. Given the absence of evidence to contradict Akers's testimony, a jury could reasonably rely on Akers's testimony to find that Alexander conspired with Lopez despite Alexander's denials. See Meza-Gonzalez, 394 F.3d at 592; United States v. Reed, 297 F.3d 787, 789 (8th Cir. 2002) (permitting juries to "draw an inference of guilt" based on "disbelief of defendant's denials" when corroborated by other evidence).

Alexander's actions support the reasonableness of the jury's findings. Alexander sat in Lopez's car when Lopez confronted an individual he believed to be a law enforcement official. A jury could reasonably conclude that Lopez would not have confronted the officer in the presence of Alexander if Alexander was not participating in the conspiracy.

In addition, the evidence seized from the apartment and vehicles support the conclusion that Alexander knew of, and intentionally joined, the conspiracy. During the search of the apartment and the cars, investigators found methamphetamine, marijuana, drug paraphernalia, and digital scales. Officers found additional quantities of marijuana and methamphetamine, a scale, and a drug ledger in the Ford van Alexander was seen driving on April 10, 2003. Officers found two baggies of marijuana in the car Alexander drove on April 14, 2003. This evidence makes a jury's inference that Alexander acted knowingly in furtherance of the conspiracy reasonable.

Prosecutors entered into evidence the videotape of the meeting in the mall parking lot. This tape and the testimony of Captain Henderson provide evidence of Alexander's participation in the conspiracy. This evidence places Alexander at the mall entrance approximately fifty yards from the meeting between Lopez and Pettrone, continuously scanning the parking lot. It shows he never entered the mall. It also demonstrates that Alexander's actions ceased once the meeting concluded.

Alexander argues that this circumstantial evidence merely shows that he was present, not that he was a part of a conspiracy. Alexander correctly states that we have long held that evidence of "mere presence," "even when coupled with knowledge" that someone else present intends to sell drugs, is insufficient to establish participation in a conspiracy. United States v. Cruz, 285 F.3d 692, 701 (8th Cir 2002). The evidence in this case, when taken as a whole, is sufficient to establish

participation in a conspiracy. Alexander was not only present, he actively served as a lookout.

## II.

The district court imposed a sentence of seventy-eight months. In imposing that sentence, the court attributed twelve pounds of methamphetamine to Alexander. Alexander maintains that the evidence does not support the district court's drug quantity attribution.

"We review the district court's application of the Sentencing Guidelines de novo." United States v. Johnston, 353 F.3d 617, 625 (8th Cir. 2003). "The district court's factual findings in relation to drug quantity are reviewed for clear error." Id. "We can disturb the district court's drug quantity calculation only if the entire record definitely and firmly convinces us that a mistake has been made." United States v. Titlbach, 300 F.3d 919, 923 (8th Cir. 2002).

The district court's finding that twelve pounds of methamphetamine were attributable to Alexander was not clearly erroneous. Alexander was convicted of conspiracy. "In jointly-undertaken criminal activity, a defendant is accountable for his own conduct as well as conduct taken by others that was in furtherance of the activity and reasonably foreseeable." United States v. Francis, 367 F.3d 805, 821 (8th Cir. 2004); see U.S.S.G. § 1B1.3(a)(1)(B). Accordingly, to attribute a quantity of drugs to Alexander, the factfinder must "find by a preponderance of the evidence that the transaction or activity" was: 1) "in furtherance of the conspiracy;" and 2) "either known to that defendant or reasonably foreseeable to him." United States v. Atkins, 250 F.3d 1203, 1212 (8th Cir. 2001). Under this calculus, the factfinder may consider drug amounts from transactions that Alexander was not directly involved in, so long as the other transactions were "part of the same course of conduct or scheme." Id. (quoting United States v. Brown, 148 F.3d 1003, 1008 (8th Cir. 1998)). In this case,

the district court only considered those quantities of methamphetamine that were distributed by Lopez after Alexander acted as a lookout for the meeting in which Pettrone and Lopez met to discuss future drug transactions. The delivery of twelve pounds of methamphetamine occurred four days after Alexander became involved in the conspiracy. The delivery of that amount of methamphetamine was reasonably foreseeable to him given his participation as a lookout for the earlier negotiations. Although Alexander did not participate directly in the sale of twelve pounds of methamphetamine, Alexander's actions were part of the same conspiracy.

Alexander argues that the district court erred because there was no factual basis for concluding that he knew of, or could have reasonably foreseen, the amount of drugs involved. The district court's finding that the amount was reasonably foreseeable does not constitute clear error. The drug paraphernalia found in Alexander's apartment, including digital scales commonly used to weigh controlled substances, provide evidence that Alexander was aware of the size of Lopez's drug transactions. Alexander knew that Lopez's deal was sufficiently valuable and dangerous to attract the attention of the police and therefore require a lookout. Further, the baggies of drugs found throughout the apartment and vehicles demonstrate that Alexander was aware of the presence of drugs in varying amounts throughout his apartment. This evidence, along with his service as a lookout and willingness to confront the police show a "substantial level of commitment to the conspiracy." Brown, 148 F.3d at 1008. Commitment to the conspiracy, along with degree to which a defendant benefitted from his co-conspirators actions, are "factors relevant to foreseeability." Id. This evidence shows a sufficient level of commitment to make the amount attributed to Alexander reasonable. This is not a case where paraphernalia and other evidence suggest a certain quantity range and a sentencing court finds a quantity disproportionate to what the evidence suggests. Rather, this situation is analogous to the person who transports a quantity of drugs in a suitcase without knowing the amount in the suitcase. U.S.S.G. § 1B1.3 n. 2(a)(1). While Alexander may not have known the precise quantity of drugs involved in the

transaction for which he was a lookout, the amount attributed to him was reasonably foreseeable to Alexander.  We hold, therefore, that the district court's attribution of twelve pounds of methamphetamine to Alexander does not constitute clear error.

III.

Alexander asserts that the district court's drug quantity calculation violated his rights under Blakely v. Washington, 124 S.Ct. 2531 (2004), because those findings were neither admitted by him nor made by a jury based upon proof beyond a reasonable doubt.

In Blakely, the Supreme Court held that the imposition of a sentence enhancement above the State of Washington's Sentencing Reform Act's range, based solely on the factual findings of the sentencing judge, violated the defendant's Sixth Amendment rights.  Blakely, 124 S. Ct. at 2537.  The imposition constituted a Sixth Amendment violation because the findings were neither admitted by the defendant nor found by a jury beyond a reasonable doubt.  Id.  Following Blakely and while this appeal was pending, the Court held in United States v. Booker, 125 S.Ct. 738 (2005), that "the Sixth Amendment as construed in Blakely does apply to the [Federal] Sentencing Guidelines." Booker, 125 S.Ct. at 746.  Under the Booker regime, "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by . . . a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."  Id. at 756.

Although Alexander did object to the district court's finding of sufficient evidence to support his conviction and the quantity of drugs attributed to him, he did not raise a Sixth Amendment objection.  Accordingly, our review is limited to determining whether Alexander's sentence constitutes plain error.  See United States v. Pirani, 406 F.3d 543, 2005 WL 1039976, *4 (8th Cir. Apr. 29, 2005).  To establish

plain error, Alexander must show that (1) there was an error; (2) the error was plain; and (3) that the error affected substantial rights. <u>Johnson v. United States</u>, 520 U.S. 461, 466-67 (1997). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." <u>Id.</u> (internal quotations omitted). Further, the defendant has the burden of proving plain error. <u>United States v. Olano</u>, 507 U.S. 725, 734-35 (1993).

In <u>Pirani</u>, we held that a <u>Booker/Blakely</u> error "affects substantial rights" if there is a reasonable probability that but for the error he would have received a more favorable sentence. <u>Pirani</u>, 406 F.3d 543, at *6. In this case, Alexander, like the defendant in <u>Pirani</u>, has not shown a "reasonable probability" the district court would have imposed a more favorable sentence if the Guidelines had been applied in an advisory manner, rather than in a binding fashion. The fact that Alexander was sentenced at the bottom of the Guideline range "is insufficient, without more, to demonstrate a reasonable probability that the court would have imposed a lesser sentence absent the <u>Booker</u> error." <u>Pirani</u>, 406 F.3d 543, at *7. Because the record, when taken as a whole, does not indicate that the district court would have imposed a more favorable sentence under the new sentencing regime, Alexander cannot establish the substantial rights prong of the analysis. Accordingly, he fails to meet his burden to prove that the district court committed plain error in imposing the sentence enhancements.

For the foregoing reasons, we affirm Alexander's conviction and sentence.

_____