# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1761

_____

United States of America,                    *
                                             *
            Appellee,                        *
                                             *
      v.                                     *
                                             *
Henry Ruiz,                                  *
                                             *
            Appellant.                       *


_____

No. 05-1762

_____

United States of America,                    *
                                             *
            Appellee,                        *
                                             *
      v.                                     *
                                             *
Carl A. Chatman,                             *
                                             *
            Appellant.                        *

_____

No. 05-1804

_____

United States of America,                    *
                                             *
          Appellee,                    *
                                             *
    v.                                     *
                                             *
Joseph Gonzales,                             *
                                             *
          Appellant.                   *


_____

No. 05-1805

_____

United States of America,                    *
                                             *
          Appellee,                    *
                                             *
    v.                                     *
                                             *
Michael A. Aviles,                           *
                                             *
          Appellant.                   *


_____

No. 05-1913

_____

United States of America,                    *
                                             *
          Appellee,                    *

v.                                 *
                                   *
Kevin C. Darks,                    *
                                   *
                                   *
        Appellant.                 *


_____

                                   Appeals from the United States
No. 05-2088                        District Court for the
_____                        Western District of Missouri.


United States of America,          *
                                   *
        Appellee,                  *
                                   *
v.                                 *
                                   *
Robert Lopez,                      *
                                   *
        Appellant.                 *


_____

No. 05-2601
_____

United States of America,          *
                                   *
        Appellee,                  *
                                   *
v.                                 *
                                   *
Augustine C. Aviles,               *
                                   *
        Appellant.                 *


_____

Submitted: January 9, 2006
Filed: May 1, 2006 (Corrected on: 05/05/06)
(Corrected on: 05/16/06)
_____

Before MURPHY, FAGG, and SMITH, Circuit Judges.
_____

SMITH, Circuit Judge.

The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") executed a reverse-sting operation involving a large quantity of narcotics at a warehouse in Kansas City, Missouri. The reverse sting resulted in the arrest of Henry Ruiz, Carl Chatman, Daniel Ramirez, Joseph Gonzales, Michael Aviles, Kevin Darks, Robert Lopez, and Augustine Aviles. A jury convicted the men of narcotics and weapons crimes, as well as criminal forfeiture. In this consolidated appeal, appellants have filed separate briefs raising issues regarding sufficiency of the evidence, juror misconduct, evidentiary error, severance, and sentencing error. We affirm the district court's[1] judgment in all respects.

## I. *Background*

We begin with a thorough factual review to address the appellants' sufficiency of the evidence arguments. Prior to the events relevant to the appeal, Angel Torres trafficked in illegal narcotics, supplying drug dealers in Kansas City, Missouri, with narcotics from Mexico. After his arrest, Torres worked with the ATF as a confidential informant.

In October 2003, the ATF initially sent Torres to Kansas City, Missouri, to assist in the investigation of a particular suspected large-scale drug dealer. Torres himself had previously been a large-scale supplier of illegal narcotics to the Kansas

---

[1]The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

City area. Police intended to use Torres to make contact with this person and then arrange a reverse-sting operation.[2] Instead, Torres encountered a person known as "Yogi," who Torres knew to be involved in the narcotics trade. The two men traveled to a bar in Kansas City's Westport area for a few beers, where they discussed a potential large-scale narcotics transaction. A short time later, Yogi introduced Torres to appellant Augustine Aviles ("Augustine"). Torres observed Augustine give Yogi an unknown amount of cash. Yogi went to the restroom a few minutes later. In Yogi's absence, Torres told Augustine he was bringing up a "little something something" from Texas for Yogi, and Augustine responded that he was the "dog getting rid of that something something." The two exchanged phone numbers.

The next day, Torres met with Augustine at a local restaurant. Augustine briefly questioned the legitimacy of Torres's credentials, asking Torres to produce his Texas driver's license. Once Augustine was satisfied, the two men discussed a potential business relationship in illegal narcotics. Augustine boasted of his narcotics selling prowess in Kansas City and represented that he could quickly distribute large quantities of narcotics in the area.

Later that night, Augustine invited Torres to his home. In Augustine's home, Torres observed approximately 500 grams of cocaine and a pound of marijuana on the kitchen table. On the dining room table, Torres saw approximately eight to ten pistols. Augustine and Torres discussed exchanging guns for drugs. At some point during this conversation, Michael Aviles ("Michael"), Augustine's brother, entered the room. Augustine then called Carl Chatman into the room and told him to retrieve three assault rifles, which Chatman did. After this meeting, law enforcement decided to make Augustine the primary investigatory target. The following day, Augustine gave Torres a tour of Kansas City to assure Torres of his ability to quickly distribute

---

[2] In a "reverse-sting operation," a government agent sells or negotiates the sale of a controlled substance to a suspect.

as much narcotics as Torres could provide. Torres then left Kansas City and returned to Texas.

Over the next month, Augustine and Torres spoke on the phone multiple times, and law enforcement recorded many of these conversations. Torres agreed to deliver to Augustine 400 pounds of marijuana and 2 kilograms of cocaine. The men negotiated a price of $375 per pound of marijuana and $17,000 per kilogram of cocaine. Augustine made several references to already having buyers in place for the drugs.

In a recorded conversation before the reverse sting, Torres informed Augustine that the truck was in route to Kansas City, and Augustine responded that he had a crew in place to unload the truck. Torres indicated that the truck carried the amount of narcotics ordered by Augustine, as well as additional drugs bound for Chicago. Augustine replied that the trip to Chicago might be unnecessary, implying that he could distribute the entire contents of the truck in Kansas City. Augustine further stated that he and his crew would place the drugs in one vehicle, which would be escorted by other vehicles, and that nobody better stop the vehicle with the drugs because they were "going for life or death."

Augustine and Torres arranged to meet at the Ameristar Casino in Kansas City on the night of the truck's arrival. That night, a surveillance officer observed several vehicles meet at the casino. Augustine and Michael got out of one vehicle and rode with Torres to the warehouse where the truck was to deliver the drugs. On the way, Michael made several comments about how the deal was going to be a success and how they would get rid of all the drugs. Augustine reiterated his intention to harm police if they stopped the vehicle carrying the drugs. Also while en route, Michael received phone calls from the other vehicles and instructed the callers to stay close behind them and not to lose them.

In preparation for the sting, law enforcement officials outfitted the warehouse and the trailer of the truck delivering the narcotics with surveillance cameras. Four cameras placed in the warehouse and one in the trailer provided several angles of the scene. Officers planned to record the activity of Torres and each of the eight defendants[3] while in the warehouse.

Upon arrival at the warehouse, Torres unlocked the warehouse and directed the blue minivan into the building, followed by the silver minivan. Torres then closed the warehouse door to avoid drawing unnecessary attention. After the door was closed, Ruiz took a gun wrapped in a baby blanket from the blue minivan, in which he had ridden, and gave it to Augustine. Augustine, in the presence of Ruiz, Darks, Chatman, and Gonzales, gave the gun to Torres as a "gift from his heart."

After the tractor trailer arrived with the drugs, all eight defendants and Torres went to the front of the warehouse to get ready to unload the trailer. Torres opened the warehouse door and entered the back of the tractor trailer to help Special Agent Cheatham (who had driven the tractor trailer) unload the boxes of narcotics. The truck carried 5 boxes, each of which contained 80 pounds of marijuana. One of the boxes also contained 2 kilograms of fake cocaine. Special Agent Cheatham testified that the odor of marijuana was evident around the trailer as the boxes were being unloaded. Of the five boxes of narcotics, three boxes were unloaded from the truck before the police raided the warehouse. Chatman carried the first box into the warehouse, which he placed behind the blue minivan that he drove to the warehouse. Ruiz carried the second box and placed it behind the blue minivan. Michael reached for the third box, but the box was ultimately carried by Ramirez and placed behind the blue minivan.

Torres then walked to the rear of the blue minivan. There, he opened one of the boxes and dumped the bricks of marijuana onto the floor of the warehouse. He

---

[3]The appeal of the eighth defendant, Daniel Ramirez, was severed from this appeal.

instructed the defendants to count the drugs, which Michael, Ramirez, and Lopez proceeded to do. From across the warehouse, Cheatham yelled to Torres that the third box contained the cocaine. Torres retrieved the cocaine and gave it to Augustine, who placed it in the back seat of the blue minivan.

At this point, Torres signaled police to initiate arrest. The police proceeded to arrest the defendants after startling them with a loud flash-bang device. During the arrest, Chatman pointed a gun at the law enforcement team as they entered the warehouse but ultimately surrendered. Darks was caught on video discarding a revolver[4] while attempting to flee. Two other handguns were recovered from the blue minivan, and ammunition recovered from Ruiz's person matched one of these two handguns.

A federal grand jury returned a twelve-count superceding indictment charging the defendants with various narcotics and weapons crimes, as well as criminal forfeiture.[5] At trial, Augustine testified that none of the other defendants were aware

---

[4]In addition to the firearms recovered, police found seven portable radios that were tuned to the same frequency. Two radios were found in each of the three vehicles that the defendants drove to the warehouse. The other radio was found on the warehouse floor. Law enforcement also seized $13,400, which was to be the down payment for the drugs.

[5]Count I charged all of the defendants with conspiracy to distribute 500 grams or more of cocaine and 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1), and 846. Count II charged all of the defendants with possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1). Count III charged all of the defendants with possession with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1). Counts IV through XI charged each of the eight defendants individually with possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 934(c)(1)(A). Count XII charged all of the defendants with criminal forfeiture pursuant to 21 U.S.C. § 853.

that they were going to pick up narcotics at the warehouse that night, claiming that he told the other seven that they were going to pick up cleaning supplies.

After a two-week trial, the jury returned guilty verdicts on all counts as to Augustine Aviles, Michael Aviles, Carl Chatman, Henry Ruiz, Joseph Gonzales, and Kevin Darks. The jury convicted Daniel Ramirez and Robert Lopez on all counts with the exception of the count involving possession of cocaine with intent to distribute. The jury also returned special verdicts for the amount of narcotics attributable to each defendant for sentencing purposes.[6]

On appeal, each appellant filed separate briefs through counsel. Two of the appellants, Chatman and Gonzales, have also filed *pro se* briefs. For the following reasons, we affirm in all respects.

## II. *Discussion*
### A. *Sufficiency of the Evidence*

Defendants Ruiz, Michael, Darks, Lopez, Chatman, and Gonzales challenge the sufficiency of the evidence at trial. In the alternative, they contend that the district court should have given them a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Lopez also challenges the sufficiency of the evidence presented to the grand jury.

"We review the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." *United States v. Alexander*, 408 F.3d 1003, 1008 (8th Cir. 2005) (citation and internal quotations omitted). We reverse only if no reasonable jury could have found the

---

[6]Two of the special verdicts are relevant on appeal. The jury attributed to Augustine the entire 400 pounds of marijuana and 2 kilograms of cocaine. The jury attributed to Darks the 2 kilograms of cocaine but only 240 pounds of marijuana.

defendants guilty. *Id.* "[W]e will uphold the verdict if there is any interpretation of the evidence that could lead a reasonable-minded jury to find the defendant[s] guilty beyond a reasonable doubt." *United States v. Hamilton*, 332 F.3d 1144, 1149 (8th Cir. 2003).

With respect to the Rule 33 argument, "A district court may grant a new trial for insufficiency of the evidence 'only if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred.'" *United States v. Lacey*, 219 F.3d 779, 783 (8th Cir. 2000) (quoting *United States v. Brown*, 956 F.2d 782, 786 (8th Cir. 1992). "In making this determination, the court need not view the evidence in the light most favorable to the government, but may instead weigh the evidence and evaluate for itself the credibility of the witnesses." *Id.* at 783–84. This Court reviews a district court's denial of a motion for a new trial for "a clear and manifest abuse of discretion." *Id.* at 784.

Sufficient evidence supported each defendant's conviction, and the district court did not abuse its discretion by denying defendants' requests for a new trial. The evidence regarding what took place after the truck arrived is most probative. When the truck arrived, all of the defendants went to the back of the tractor trailer, where the odor of marijuana was evident. Chatman and Ruiz actually carried two of the boxes—each of which contained 80 pounds of marijuana—from the trailer to behind the blue minivan. Michael reached out to carry the third box, which was ultimately carried by Ramirez. Behind the blue minivan, Torres opened one of the boxes and dumped the bricks of marijuana onto the floor of the warehouse. Torres then instructed the defendants to count the drugs, which Michael, Ramirez, and Lopez proceeded to do. Cheatham yelled to Torres—from across the warehouse—that the cocaine was in the third box. Torres retrieved the cocaine and handed it to Augustine, who placed it in the back of the blue minivan.

In addition, before the tractor trailer arrived, Ruiz took a gun wrapped in a baby blanket from the blue minivan and handed it to Augustine. Augustine then gave the gun to Torres as a gift in the presence of Ruiz, Darks, Gonzales, and Chatman. Chatman and Michael were also present during the preliminary discussions between Augustine and Torres pertaining to the establishment of an illegal narcotics relationship, which took place several weeks earlier at Augustine's home.

Moreover, while riding with Torres to the warehouse, Michael made repeated references to the narcotics transaction and heard Augustine reiterate his intention to harm the police in the event that the vehicle containing the drugs was pulled over. Michael also was in communication with the other vehicles to make sure that they did not get separated from Torres's vehicle on the way to the warehouse.

Following his arrest, Darks admitted to serving as a lookout during the controlled sale. Darks told police that he was paid $100 to do so. Darks carried a handgun at the warehouse that night, and the video evidence shows him discarding the gun as he attempted to flee.

Gonzales had a prior felony conviction for possession of marijuana with intent to distribute that was properly admitted at trial pursuant to Rule 404(b) of the Federal Rules of Evidence because it tended to prove motive, knowledge, and lack of mistake so as to rebut his argument that he was merely present and unaware that a drug conspiracy was taking place.

Thus, a jury could reasonably conclude that the defendants were not merely present; there was sufficient evidence to convict each defendant of the narcotics charges, including conspiracy to distribute narcotics. Because there was sufficient evidence of conspiracy to distribute narcotics, there was sufficient evidence to support the firearms convictions, as it was reasonably foreseeable that members of the narcotics conspiracy would possess and use firearms in furtherance of the conspiracy.

*United States v. Bailey*, 235 F.3d 1069, 1074–75 (8th Cir. 2000); *see also United States v. Pinkerton*, 328 U.S. 640, 647–48 (1946).

As for the defendants' alternative argument for a new trial, we see no miscarriage of justice given the evidence of record; therefore, the district court committed no manifest abuse of discretion by denying defendants' request for a new trial. *See Lacey*, 219 F.3d at 784.

Finally, we find no merit in Lopez's argument that there was insufficient evidence before the grand jury to justify his indictment. The petit jury's ultimate finding of guilt beyond a reasonable doubt renders the alleged grand jury error, if any, harmless. *United States v. Mechanik*, 475 U.S. 66, 70 (1986); *see also United States v. Exson*, 328 F.3d 456, 459 (8th Cir. 2003) ("Dismissal due to errors in grand jury proceedings is appropriate only if the defendant shows actual prejudice.").

## B. *Juror Misconduct*

Lopez, Darks, Michael, Augustine, and Gonzales moved for a judgment of acquittal or a new trial following trial based alleged juror misconduct. Defendants alleged Juror Anna Batrez failed to disclose certain information during voir die. During voir dire, Juror Batrez indicated that she did not know any of the defendants. However, Juror Batrez noticed the presence of Angelina Aviles, Michael's and Augustine's mother, as well as Angelina's sisters, in the courthouse during trial. Juror Batrez knew these women and then deduced that they were related to Augustine and Michael Aviles. Concerned about there being a potential problem, Juror Batrez informed the courtroom deputy clerk. Neither the district court nor counsel were aware of the issue until after trial.

Pursuant to *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), a party seeking a new trial on the basis of concealed juror bias must prove three things: (1) that the juror answered dishonestly, not just inaccurately; (2) that the

juror was motivated by partiality; and (3) that the true facts, if known, would have supported striking the juror for cause. *United States v. Tucker*, 137 F.3d 1016, 1026 (8th Cir. 1998) (*Tucker I*). "Findings of fact on a *McDonough* hearing are reviewed under the 'clearly erroneous' standard of review." *United States v. Tucker*, 243 F.3d 499, 506 (8th Cir. 2001) (*Tucker II*).[7] "Honesty of the juror and actual bias are factual issues." *Id.* "The ultimate determination of whether a new trial is required is reviewed for abuse of discretion." *Id.* (citing *United States v. Williams*, 77 F.3d 1098, 1100 (8th Cir.1996)).

Following an evidentiary hearing on the alleged juror misconduct, the district court found that the juror was being truthful during voir dire when she answered that she did not know any of the defendants. The district court concluded that the juror was not motivated by bias because the juror immediately notified the district court upon recognizing the family members of the defendants, expressing her concern about the situation. There simply is no dishonesty in the juror's response to support

---

[7]In *Tucker II*, we described the level of deference accorded under the clear error standard in light of *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–75 (1985):

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. We may reject the fact finder's choice between conflicting evidence only where there is something wrong with the choice. Furthermore, when findings are based on determinations regarding the credibility of witnesses, the level of deference is even higher than the standard already described.

*Tucker II*, 243 F.3d at 506 (citations and internal quotations omitted).

an allegation of bias.[8] Rather, the juror's honesty is reflected by her self-disclosure. Moreover, the facts show no motive for partiality by the juror.[9] We hold that the defendants fail to establish that Juror Batrez was biased. Therefore, we affirm the district court's denial of the defendants' motion for a new trial.

## C. *Video Evidence*

Darks challenges the government's use of video evidence at trial. Prior to the reverse-sting operation, law enforcement placed four hidden cameras in the warehouse and one hidden camera in the trailer. At trial, the government entered fourteen digital video discs (DVDs) into evidence. Nine discs consisted of compiled videos—one for each defendant and one for government witness Torres. Each compiled video tracked the movements of a particular individual from the time he arrived at the warehouse until his arrest. The remaining five discs contained the entire, unedited video recordings made by each of the five hidden cameras. The government played the nine compiled videos to the jury at trial, whereas the other five discs were admitted into evidence and available to the jury.

Darks claims that the compiled DVDs should have been excluded under Rule 403 of the Federal Rules of Evidence. Specifically, Darks claims that the probative value of the compiled videos was substantially outweighed by their prejudicial

---

[8]During voir dire, Juror Batrez indicated that she did not know any of the defendants.

[9]At the time of the trial, Juror Batrez had not seen Angelina or her sisters, Rose and Hope, for years. While Juror Batrez knew that Angelina had sons, Juror Batrez did not know their names and prior to trial had neither met nor seen Michael or Augustine Aviles. In fact, before the evidentiary hearing, Juror Batrez did not even know how Michael and Augustine were related to Angelina, Rose, and Hope. With regard to Juror Batrez's son Tony having a fight with Angel Aviles, the older brother of Michael and Augustine, Juror Batrez was not aware of this specific incident, and there was no evidence that Tony even knew either Michael or Augustine, much less that he had any problems with them.

impact. He contends his individualized video prejudiced his defense because it "over-emphasized his involvement" in the narcotics transaction so as to deny him a fair trial. He posits that "the probative value of the evidence was limited by the fact that the individual video presentations were composites prepared by government agents." We disagree.

We review a district court's decision overruling a Rule 403 objection for an abuse of discretion. *United States v. Looking Cloud*, 419 F.3d 781, 785 (8th Cir. 2005). Rule 403 provides, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of *unfair* prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403 (emphasis added). "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997); *see also* Fed. R. Evid. 403 advisory committee's note ("'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.").

The individualized nature of the videos does not undermine their probative value nor make their possible prejudicial effect unfair. Rule 403 only bars admission of *unfairly* prejudicial evidence. *Old Chief*, 519 U.S. at 180. The compiled video of Darks did not lure the jury to convict him for a reason other than his guilt. To the contrary, compiling the unedited videos made the recordings more helpful to the jury by making it easier for them to see the government's evidence against each defendant individually. Because the compiled videos were probative and not unfairly prejudicial, we hold that the district court did not abuse its discretion by overruling Darks's Rule 403 objection to the evidence.

D. *Motions for Severance*

Darks and Gonzales argue that their motions for severance should have been granted. "In general, persons charged in a conspiracy or jointly indicted on similar evidence from the same or related events should be tried together." *United States v. Adkins*, 842 F.2d 210, 211 (8th Cir. 1988). However, under Federal Rule of Criminal Procedure 14,[10] if a party will be prejudiced by the joinder, the trial court may grant a severance. *Id*. "To make a showing of prejudice, an appellant must establish something more than the mere fact that he would have had a better chance for acquittal had he been tried separately." *Id*. at 212. "The appellant must demonstrate that the jury was unable to compartmentalize the evidence as it related to the separate defendants." *Id*. "A denial of a motion to sever will not be reversed unless clear prejudice and an abuse of discretion are shown." *United States v. Pherigo*, 327 F.3d 690, 693 (8th Cir. 2003). We hold that the district court did not abuse its discretion as to either defendant.

1. *Darks*

In closing arguments, Darks's trial counsel drew attention to the redactions in Darks's post-arrest statements. Counsel sought to highlight allegedly inconsistent reports by two law enforcement officers regarding who Darks said offered him $100 to serve as a lookout. The district court sustained the government's objection that this line of argument threatened to impermissibly prejudice the other defendants. Darks's counsel then moved for severance, which the district court denied.

---

[10]Rule 14 reads in pertinent part "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a).

On appeal, Darks contends that this rendered him unable to present fully his defense that his statements did not implicate him in the conspiracy. We disagree and hold that Darks has failed to show how he was prejudiced. The district court only barred Darks from drawing attention to the redactions in the statements, which was intended to prevent Darks from injecting reversible error at the end of a lengthy trial. Darks was still free to argue that the statements were vague and unrecorded, and that the officers' testimony regarding the statements was similarly illusive. Therefore, Darks was not prevented from mounting a defense, and the denial of his motion for severance was not an abuse of discretion.

### 2. *Gonzales*

Gonzales contends that the evidence against him was minimal and that as a result, he could have only been convicted on account of the cumulative evidence against the other defendants. We have already held that there was sufficient evidence to convict Gonzales. Furthermore, Gonzales "must establish something more than the mere fact that he would have had a better chance for acquittal had he been tried separately." *Adkins*, 842 F.2d at 212. Gonzales was still free to argue the supposed lack of evidence against him. The jury ultimately rejected the argument and found him guilty. We hold that the district court did not abuse its discretion by denying Gonzales's motion for severance.

### E. *Sentencing Error*

Two defendants allege sentencing error. Augustine Aviles contends that the district court erred by sentencing him based upon the quantity of drugs that the government sought to sell rather than the quantity of drugs that he could have purchased for $13,400, the amount of cash that he brought with him on the night of his arrest. Darks argues that the district court erred in calculating the drug quantity attributable to him as well and also that his sentence was unreasonable.

"We review a challenge to the district court's interpretation and application of the advisory guidelines de novo and the court's factual findings for clear error." *United States v. Blazek*, 431 F.3d 1104, 1109 (8th Cir. 2005). Post-*Booker*, the calculation of the advisory Guidelines range represents the "critical starting point." *United States v. Thomas*, 422 F.3d 665, 669 (8th Cir. 2005); *see also United States v. Haack*, 403 F.3d 997, 1002–03 (8th Cir. 2005). The district court may then exercise its discretion to impose a sentence within or outside of the Guidelines range by taking into account 18 U.S.C. § 3553(a). *Thomas*, 422 F.3d at 669.

"We review sentences within or outside the guidelines range for reasonableness." *United States v. Hawkman*, 438 F.3d 879, 882 (8th Cir. 2006). In determining reasonableness, the "primary point of reference" is the factors of § 3553(a). *United States v. Hadash*, 408 F.3d 1080, 1083 (8th Cir. 2005). "Reasonableness review is 'akin to abuse of discretion review[.]'" *United States v. Sebastian*, 436 F.3d 913, 915 (8th Cir. 2006) (quoting *United States v. Rogers*, 423 F.3d 823, 829 (8th Cir. 2005)). An abuse of discretion may occur "if a sentencing court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only appropriate factors but nevertheless commits a clear error of judgment by arriving at a sentence that lies outside the limited range of choice dictated by the facts of the case." *Haack*, 403 F.3d at 1004.

## 1. *Augustine Aviles*

The district court attributed 400 pounds of marijuana and 2 kilograms of cocaine to Augustine. Augustine posits that he should have only been held accountable for the amount of drugs that he reasonably could have purchased with the $13,400 in cash that he brought to the warehouse. This argument represents an allegation of what has become known as "sentencing entrapment."

Entrapment, as a defense to criminal liability, developed from concern that the government might induce an otherwise law-abiding individual to engage in criminal conduct. *See* WAYNE R. LAFAVE, CRIMINAL LAW §5.2(a) (3d. Ed. 2000). The concept of "sentencing entrapment," by comparison, represents a more recent development in response to modern sentencing-guidelines systems. *See United States v. Barth*, 990 F.2d 422, 424–25 (8th Cir. 1993) (explicitly recognizing the legal availability of sentencing entrapment as a grounds for departure under the federal Sentencing Guidelines); *see also* U.S.S.G. § 2D1.1, comment n.14. In the case of a narcotics crime, the drug quantity involved acts as a primary determinate of a defendant's sentence under the Guidelines. *United States v. Searcy*, 233 F.3d 1096, 1099 (8th Cir. 2000) (*Searcy I*); *United States v. Stavig*, 80 F.3d 1241, 1245 (8th Cir. 1996); *Barth*, 990 F.2d at 425. "Therefore, relatively small differences in the quantity or kind of drugs involved in an offense may dramatically alter a defendant's prison term." *Searcy I*, 233 F.3d at 1099.

"Sentencing entrapment occurs when official [government] conduct leads a defendant predisposed to deal only in small quantities of drugs to deal in larger quantities, leading to an increased sentence." *Searcy I*, 233 F.3d at 1099 (quoting *United States v. Berg*, 178 F.3d 976, 981 (8th Cir. 1999)) (brackets by *Searcy I*) (internal quotations omitted). If a defendant establishes sentencing entrapment, "the court shall exclude from the offense level determination the amount of controlled substance that the defendant establishes that the defendant did not intend to provide or purchase or was not reasonably capable of providing or purchasing." U.S.S.G. § 2D1.1, comment n.12;[11] *e.g., Searcy I*, 233 F.3d at 1099. Although the predisposition

[11]U.S.S.G. § 2D1.1, comment n.12, provides in relevant part that

If . . . the defendant establishes that the defendant did not intend to provide or purchase, or was not reasonably capable of providing or purchasing, the agreed-upon quantity of the controlled substance, the court shall exclude from the offense level determination the amount of controlled substance that the defendant

-19-

of the defendant to commit the crime represents the major focus of the sentencing entrapment analysis, *Searcy I*, 233 F.3d at 1099, the government's conduct acts as a triggering mechanism, i.e., the defendant must prove that "the government induced the defendant to commit the crime." *United States v. Searcy*, 284 F.3d 938, 942 (8th Cir. 2002) (citations and internal quotations omitted) (*Searcy II*). Thus, a court initially must determine whether the government induced the defendant.

In a reverse-sting operation, inducement occurs when the government "set[s] a price for the controlled substance that was substantially below the market value of the controlled substance[.]" U.S.S.G. § 2D1.1, comment n.14.[12] In addition to its literal meaning, the term "price" includes credit arrangements, commonly known as "fronting," that are found unusually generous in light of market practices. *United States v. Lora*, 129 F. Supp. 2d 77, 91 (D. Mass. 2001); *see Stavig*, 80 F.3d at 1246 ("This transaction fails to show that the government provided Stavig with a financial arrangement so attractive that he was able to purchase a significantly larger quantity than he would have otherwise purchased.").

---

did not intend to provide or purchase or was not reasonably capable of providing or purchasing.

[12]U.S.S.G. § 2D1.1, comment n.14, provides in relevant part that

If, in a reverse sting (an operation in which a government agent sells or negotiates to sell a controlled substance to a defendant), the court finds that the government agent set a price for the controlled substance that was substantially below the market value of the controlled substance, thereby leading to the defendant's purchase of a significantly greater quantity of the controlled substance than his available resources would have allowed him to purchase except for the artificially low price set by the government agent, a downward departure may be warranted.

We have not previously set forth parameters to analyze whether a credit arrangement accepted by the government constitutes an arrangement substantially below market. A generous credit arrangement becomes increasingly suspect where the government possesses limited assurances of the defendant's ability to be trusted with repayment. *See Lora*, 129 F. Supp. 2d at 94–95; *cf. Stavig*, 80 F.3d at 1246 (holding that the government did not provide the defendant with an overly generous financial arrangement, reasoning that the defendant had received cocaine from the confidential informant before under similar terms). The government may obtain sufficient assurances in a variety of ways, such as when a trusted third-party trafficker vouches for the defendant, the defendant socializes with undercover agents to earn their trust, the defendant presents assets that could be used to satisfy the debt, and the defendant provides information about the extensiveness of his drug-trafficking operation in order to demonstrate his ability to distribute the relevant drug quantity and make repayment. *Lora*, 129 F. Supp. 2d at 94–95. Other forms of assurances might also suffice, and the determination should ultimately be made in light of the totality of the circumstances.

As to drug quantity, the defendant must prove that he was "predisposed to deal only in small quantities of drugs[.]" *Searcy I*, 233 F.3d at 1099 (quoting *Berg*, 178 F.3d at 981) (internal quotations omitted). This requires the defendant to prove that he had "neither the intent nor the resources for completing" the transaction of the quantity alleged. *Stavig*, 80 F.3d at 1246–47 (quoting *United States v. Naranjo*, 52 F.3d 245, 250 (9th Cir. 1995)) (internal quotations omitted); *see also* U.S.S.G. § 2D1.1, comment n.12.

When determining whether a defendant was predisposed to deal in a smaller drug quantity, a court should consider not only the defendant's cash on hand, but also other facts indicative of intent and resources. Relevant considerations include whether the government's agent pressured the defendant, whether the defendant desired the alleged quantity of drugs, whether the defendant communicated an ability

to repay the debt within a reasonable time, whether the defendant has previously distributed substantial quantities, and whether the defendant expressed his intent to engage in future dealings of similar size or scale. *Lora*, F. Supp. 2d at 93–94 (citing *United States v. Montoya*, 62 F.3d 1, 4 (1st Cir. 1995) and *United States v. Woods*, 210 F.3d 70, 75–76 (1st Cir. 2000)).

Torres testified that—based upon his experience as a former supplier of illegal narcotics to the Kansas City area—he would have been comfortable fronting $170,600 worth of narcotics to Augustine because Torres believed that Augustine would not have attempted to rip him off. This is because Torres was satisfied with Augustine's reliability based on their contacts in person and over the phone, as well as the fact that Torres knew where Augustine lived and had been to his residence.

Augustine attacks Torres's testimony as "devoid of logic," arguing that there was insufficient trust between the two men because they had no prior business relationship and because Torres had no third-party assurances that Augustine was reliable. Indeed, Special Agent Cheatham testified that fronting "was not unusual as long as there is some element of trust or someone's vouched for the person that's getting the load or if they've done business previous to that . . . ." Augustine contends because there was no basis for such trust between himself and Torres, the credit arrangement offered by the government was substantially below the market under the circumstances of this case. Augustine also notes that the government used the same 400 pounds of marijuana and the same warehouse to conduct a reverse-sting operation on another, unrelated individual a short time prior to the arrest of Augustine and his co-defendants. Augustine believes that this supports his contention that the government set the drug quantity solely to enhance his sentence.

Here, the record indicates that the district court did not commit clear error by denying Augustine's sentencing entrapment claim. The credit arrangement presents a close question. Augustine was prepared to pay $13,400 on the night of the

transaction, less than 8 percent of the total transaction price of $184,000.[13] Torres had few assurances of Augustine's reliability, but Torres's testimony provides sufficient evidence that the credit arrangement was not artificially generous. Also, the two men freely bargained about both the price and drug quantity.[14]

Augustine also fails to prove lack of predisposition to deal in the quantity attributed to him. Minimal inducement was required, as Augustine expressed willingness to distribute narcotics in response to Torres's first remark regarding Yogi. Augustine stressed the capability of his operation to distribute and pay for the entire drug quantity. Beginning with the initial contact with Torres and continuing through to his statements while driving to the warehouse, Augustine repeatedly assured Torres that he had a network in place to quickly move a large quantity of drugs, that he already had buyers in place for the shipment, and that he could have full payment in just a few days. On the way to the warehouse, Michael also stated that the deal was going to be a success and how they would get rid of all the drugs. In addition, Augustine made numerous statements that he wanted a large shipment and that he was willing to accept an even larger quantity of drugs, including his statement that

[13]As mentioned, the parties agreed to a price of $375 per pound of marijuana and $17,000 per kilogram of cocaine. Augustine agreed to purchase 400 pounds of marijuana and 2 kilograms of cocaine. Thus, the total price of the narcotics that Augustine agreed to purchase in this transaction was $184,000. Subtracting the $13,400 that Augustine possessed on the night of his arrest, the amount of fronted narcotics equaled $170,600. In other words, Torres was fronting Augustine approximately 92.72 percent of the purchase price.

[14]The price and quantity were the product of negotiations between Augustine and Torres, making Augustine's reliance on *United States v. Hicks*, 1999 WL 1073672, at *3–5 (6th Cir. 1999) (unpublished), misplaced. The case at bar is distinguishable from a situation in which the price was unilaterally set by the government or the drug quantity was not known to the defendant. *See Hicks*, 1999 WL 1073672, at *3–5 (remanding for re-sentencing because the defendant never knew the quantity of drugs to be distributed to him, as the quantity was set either by the supplier in Columbia or by the government).

the truck might not need to go to Chicago because he could distribute the entire truckload. As mentioned above, the price and drug quantity were reached after bargaining between the two men.

On this record, we hold that the district court did not commit clear error by holding Augustine accountable for the entire quantity of drugs that he agreed to purchase. The record supports the finding that the government did not induce the defendant to engage in the negotiated narcotics transaction but rather that the defendant possessed the intent and the resources to complete the deal as negotiated.

### 2. *Darks*

Darks raises two allegations of sentencing error. First, Darks argues that the district court erred in computing drug quantity. Second, he alleges that his sentence is unreasonable, asserting that the district court treated the Guidelines as essentially mandatory. Darks's arguments on both issues are without merit. As to drug quantity, Darks ignores circuit precedent, which states that "[i]n jointly-undertaken criminal activity, a defendant is accountable for his own conduct as well as conduct taken by others that was in furtherance of the activity and reasonably foreseeable." *United States v. Alexander*, 408 F.3d 1003, 1009 (8th Cir. 2005) (quoting *United States v. Francis*, 367 F.3d 805, 821 (8th Cir.2004)); *see* U.S.S.G. § 1B1.3(a)(1)(B). With respect to reasonableness of the sentence, Darks contends that the district court imposed a sentence as though the Guidelines were still mandatory. We disagree. The district court correctly referenced the Guidelines as advisory and sentenced him to the low end of the Guidelines range. Darks challenges the reasonableness of his sentence considering the aberrational nature of his behavior. However, the record reflects the district court considered all the factors in § 3553(a). We cannot say the sentence is unreasonable.

### F. Pro Se *Briefs*

We have reviewed the supplemental *pro se* briefs filed by Darks and Gonzales, and we affirm on the issues raised without comment. *See* 8th Cir. R. 47B.

### III. *Conclusion*

For the reasons discussed, we affirm in all respects.

_____